**REED & PRINCE MFG. CO. v. LEAR, Inc.**

**Civ. No. 1041.**

District Court, W. D. Michigan, S. D.
June 7, 1948.

Fuller, Sherk & Dilley and Glenwood C. Fuller, all of Grand Rapids, Mich., and Howell Van Auken of Detroit, Mich., for plaintiff.

Warner, Norcross & Judd and Harold S. Sawyer, Jr, all of Grand Rapids, Mich., for defendant.

STARR, District Judge.

Plaintiff is a manufacturer of bolts, screws, rivets, and other specialities in the city of Worcester, Massachusetts. Defendant is a manufacturer of radios and other products in the city of Grand Rapids, Michigan. On March 25, 1946, defendant gave a written purchase order, which plaintiff accepted, for 3,216,000 bolts (also referred to as screws) at a price of $2.80 a thousand. The parties subsequently agreed to reduce the number of bolts ordered to 1,785,000 and to increase the price to $3.13 a thousand. The bolt was designed by defendant,

and a drawing accompanying its order specified the dimensions of the bolt and the tolerance allowable in the diameter of the knurled or fluted portion thereof.

In its order defendant specified that delivery of bolts was "requested" at the rate of 357,000 on April 15, 1946, 357,000 on the 15th of each month thereafter through September, and 358,000 on the 15th days of October, November and December. The order further stated: "Partial shipment urgently needed early May. Quoted delivery—1st shipment about 8 weeks." The order also contained, among other things, the following provisions:

"(3) Inspection: All materials or articles ordered will be subject to final inspection and approval at the plant of the Buyer. * * *

"(11) The Buyer reserves the right to cancel order if material is not shipped within specified time, or if the quality of the articles is not as specified herein, but any such cancellation shall release Seller from any obligation accruing before such cancellation. * * *

"(16) * * * Upon receipt of any notice of cancellation the Seller shall, unless the notice otherwise directs, immediately discontinue all work and the placing of all orders for materials and supplies in connection with this order and shall immediately cancel all existing orders and subcontracts made hereunder. Notice of cancellation may be given in person or by telephone, telegraph or other writing."

During the summer of 1946, there passed between the parties a series of telegrams, telephone calls, and correspondence in which defendant was pressing for delivery of bolts and in which plaintiff was indicating its inability to make delivery. Plaintiff made its first shipment of 370 bolts to defendant on August 8, 1946, and made subsequent shipments as follows: August 20th, 9,650; August 22d, 24,000; September 9th, 90,000; September 20th, 24,610; October 3d, 50,970. These shipments totaled 199,600 bolts.

On October 15th defendant wired plaintiff: "Hold production shipments and purchase of material. * * * Formal change and instructions to follow." Plaintiff's reply wire on October 16th stated: "Entire balance due your order R14466 in process of manufacture. Have held up production and shipment pending further word from you. Advise." On November 6th defendant rejected and shipped back to plaintiff approximately 165,580 of the bolts it had received, and its "debit memo" to plaintiff for these rejected bolts stated in part:

"1. The following dimensions were found to be out of drawing tolerance: * * * Knurl is tapered .001 also undersize from .001 to .002. * * *

"2. The above goods were rejected and are being returned to you under separate cover. * * *

"4. The above goods are being returned to you for the following reason: Credit."

On November 22d defendant wired plaintiff: "Cancel balance on our order R14466. Acknowledge no liability to Lear Inc for such cancellation." Plaintiff replied by wire on November 25th as follows: "Cannot cancel order R14466 without submitting cancellation charges. * * * Advise return wire."

Defendant retained and paid for 34,020 of the bolts it had received, and it may be noted that this 34,020 and the 165,580 which it had rejected and returned, comprised the total of 199,600 which plaintiff had shipped on the order of March 25th. When defendant canceled the balance of its order on November 22d, plaintiff had on hand, in addition to the 165,580 bolts returned by defendant, approximately 1,585,400 bolts which were in process of manufacture. On December 3d plaintiff wrote defendant as follows:

"The total quantity (of bolts) had been put into process and was in various stages of completion when you requested us to cancel.

"We are holding 160,400 pieces which have been completed and the balance is still in process. On the completed pieces full price will apply making a charge of $502.05. The cost of the goods in process has been figured to the point of cancellation and is $1,877.14. This makes a total charge of $2,379.19 to cancel the whole order.

"As you know all orders for special goods are accepted only under the condition

that they may not be cancelled without our permission.

"If work has not started on an order or material purchased for it, we are glad to cancel without cost. On orders which have been put into process, however, we are unable to cancel without cost as the goods have no market and are of value only to the customer for whom they are being manufactured.

"Will you please let us know whether you wish the order completed or whether we shall render an invoice to cover the costs noted above."

On December 18th defendant replied as follows:

"With reference to your letter of December 3, * * * may we advise that your failure to deliver the item on this order in accord with our requested delivery schedule and your quotation to us has cost this company thousands of dollars besides the amounts of monies spent in attempting to expedite your company for shipments. Under these circumstances this company would have every right to hold you liable for our loss due to your default. However, it is our endeavor to maintain a friendly relationship with those companies with whom we have business dealings. We shall expect your confirmation that this order has been cancelled without charge.

"In addition to the foregoing, may we draw your attention to the huge amounts of unsatisfactory material which has been returned for credit, as not being in accord with our specifications. This to us is self evidence of our justification in cancelling this agreement without charge."

The foregoing facts relate only to defendant's order of March 25, 1946, the delivery and rejection of bolts covered by that order, and defendant's cancellation on November 22d. Turning now to another transaction between these parties, it appears that on September 23d defendant wired plaintiff as follows: "We are mailing our purchase order for 22,000 each 1/2 x 2 and 3/8 x 2 slotted oval countersunk head wood screws statuary bronze finish your quotation September 19."

On the same date defendant, as indicated in this telegram, mailed its purchase order to plaintiff reading in part as follows: "22,000 part No. 12719 wood screw No. 2 x 3/8—slotted oval countersunk head steel statuary bronze finish—1.07/M. * * * 22,000 part No. 12718 wood screw, No. 2 x 1/2" slotted oval countersunk head statuary bronze finish—1.14/M."

The parties subsequently agreed to cancel that part of the order relating to "part No. 12718 wood screw, No. 2 x 1/2"." When plaintiff received defendant's telegram of September 23d, it entered an order for 22,000, ⅜ x 2, wood screws, and when it received defendant's purchase order by mail, which was referred to in the telegram, it entered another order for the same number and kind of screws. About October 23d plaintiff delivered 22,000 screws and defendant paid therefor. However, it appears that plaintiff had manufactured and now has on hand a duplicate lot of 22,000 screws, for which it claims the sale price of $23.54.

On May 13, 1947, plaintiff began the present suit and in its complaint and amended bill of particulars it asserts the following claim:

"Lear order R14466, 1,785,000 pcs. Part No. 33511—Clamp Bolt at $3.13 M.

"1. Price of 165,580 pieces complete ...................... $ 518.27

"2. Cost of work done on 1,585,400 pieces when work stopped by Lear .............. 1,285.71

"3. Profit on 1,585,400 pieces if completed ................. 1,807.36

"Lear order R30144, 22,000 pcs. Part No. 12719 —Wood Screw @ $2.24 M.

"4. Price of 22,000 pieces (3/8 x 2 wood screws) completed when work stopped by Lear    24.64  ( 23.54)

"5. Total loss (without interest) $3,635.98  (3,634.88)

"6. Less salvage value of pieces and material on hand.....    51.19

"7. Total loss (without interest) $3,584.79  (3,583.69)"

Defendant answered, denying liability for any part of the claim. It asserted as an affirmative defense that it was justified in cancelling its purchase order of March 25th because of plaintiff's defaults in delivery and because the bolts delivered were not in conformity with the specifications accompanying its order.

During the summer of 1946 defendant endeavored to obtain delivery of bolts under its order of March 25th, and plaintiff from time to time promised deliveries which it

did not make. In fact, plaintiff did not begin delivery until August 8th, and by October 3d it had shipped a total of only 199,600. However, from the telegrams, telephone calls, and correspondence that passed between the parties, it is clear that defendant waived plaintiff's default in the scheduled deliveries. In its brief defendant admits the waiver and admits that it cannot assert plaintiff's default in deliveries in justification of its subsequent cancellation of the contract.

However, defendant contends that it was entitled to cancel the contract because the bolts delivered by plaintiff did not conform to the specifications shown by the drawing which accompanied its order. In particular, defendant claims that the knurled or fluted part of a substantial number of the bolts delivered was tapered, under-sized and not within the specified outside diametral tolerance of .174 to .179 inch. Plaintiff claims that the bolts conformed to specifications and that there was no breach of contract or other ground for defendant's cancellation.

These bolts, which were about ⅜ of an inch in length, were designed by defendant for use in the construction of radio condensers, six bolts being used in a condenser assembly. The bolts were to be thrust through holes in a bakelite material in the condenser, the holes having an inside diameter slightly less than the outside diameter of the knurled or fluted portion of the bolt. It was intended that when the bolt was thrust through the hole, the peaks or edges on the knurl would cut into the bakelite and thereby prevent the bolt and attached stator from turning. The foreman of defendant's condenser department testified regarding the failure of the bolt to function as intended as follows: "I tried them but I couldn't use them, because they were too small on the knurl.

"Q. And what happened when you tried to use them? "A. * * * The bolt would turn. * * *

"The reason for that was that the knurl was not up to specification, it was not up to size."

There is no showing, nor is it claimed, that plaintiff was informed or knew of the particular purpose for which the bolt was to be used. Therefore, there was no implied warranty of fitness or that the bolt would accomplish the purpose for which it was designed and intended. Michigan uniform sales act, sec. 15 (Comp. Laws Mich.1929, sec. 9454, Stat.Ann. sec. 19.255); Gill & Co. v. National Gaslight Co., 172 Mich. 295, 137 N.W. 690. The only question is whether or not the bolt conformed to the specifications furnished by defendant.

The supervisor of plaintiff's special order department testified that in the process of manufacture, the bolts being produced were inspected from time to time to ascertain if they conformed to specifications. He also said that he had inspected many of the bolts returned by defendant as defective and that they were in conformity with the specifications. While on the witness stand, he examined several bolts which he claimed defendant had returned as defective, and he said that the knurls thereon were within the allowed tolerance and were in conformity. He also examined several of the bolts retained by defendant and admitted that the knurls on some of them were below the minimum tolerance and not in conformity. Plaintiff's managing director testified that he examined approximately 300 of the bolts returned by defendant as defective, and that he found them to be in conformity. However, this witness tested the bolts with a hole gauge, and an expert called by defendant said that bolts might pass such a test and yet not be in conformity with the specifications.

On the other hand, an engineer and a foreman employed by defendant, both of whom worked in connection with the assembly of condensers, testified that the bolts received were tapered, under-sized, and not in accordance with specifications. They said that the bolts could not be used in the assembly of condensers because the knurl, being under-sized, would not cut into the bakelite material sufficiently to prevent the bolt and attached stator from turning. During the trial several bolts were selected at random from those which defendant had retained. An expert witness called by defendant, after examining these selected bolts with a micrometer,

testified that five of the six bolts examined did not conform to specifications in that they were tapered, the diameter of the knurl was not within the allowed tolerance of .174 to .179 inch, and that the knurl was not sharp and straight. This expert also testified in part:

"Q. I call your attention to a drawing here, marked plaintiff's Exhibit 5. * * * Will you tell us what if any measurements are indicated as the size of the knurl on that drawing? * * * A. According to this print here, all it calls for is a sharp, fine, straight knurl, and that the dimensions be held from .174 to .179 for diameter, for over-all reading on the knurl. * * *

"Q. I show you some bolts here * * * which are marked defendant's Exhibit Y, and I would like you to look at those bolts and measure them if necessary, and tell me whether or not the knurl comes within the specifications as set out on the drawing. * * * A. Well, these don't come within specifications. * * *

"Here is one that would pass on the low limit, * * * that is the first one that I have run across of those six that would pass. * * *

"The only thing that I would say would cause that flattening on the knurl is that they had a very poor knurling tool. * * *

"Q. Can you tell us in what manner and to what extent the average of those bolts vary from the specifications on the knurl? A. Well, I found one here up to .175, the rest of them that I checked here, these other five run as far down as .171, which is three thousandths under the low limit. * * *

"There is bound to be a slight taper, but you have got a five thousandths tolerance, which would take up that taper. It could be made with this taper within those tolerances, that is, .174 at your low and .179 at your high, very easily.

"Q. But it was not? A. These are not.

"Q. They are under-sized on the knurl? A. Yes. * * *

"Q. Witness, I wonder if you would take the bolts out of these two baskets (condenser assemblies), and check those, or spot-check them. * * * A. They are not within print tolerance. They run

all the way from 67 to 75—that's within your tolerance, but that is not the whole knurl. There is a certain portion of some of these bolts where your knurl does not run clear to the head, and if I read the print right, the print calls for the knurl to run clear to the head. The knurl on these four that I have picked out is from 66 up to 69, which is way below the low limit. * * *

"Q. Now can you tell from an examination of those bolts whether or not they could have been rendered under-sized through some manipulation after manufacture, or if they are pretty much as manufactured, if you can tell? A. I would say one of them was damaged in assembling, the other four were not.

"Q. The other four are as manufactured? A. Right.

"Q. And they are under-sized also, and not up to specifications in that respect? A. Oh yes, definitely.

"Q. Now, could putting those bolts * * * into these holes into this type of material (bakelite) chew up or damage the teeth on the knurl to the extent that these are? A. No. That material would not damage those teeth. * * *

"Q. You spoke about a sharp knurl, what do you mean by that? A. Supposed to have a sharp edge, as it calls for, not rounded. * * *

"Some of those are nice and sharp, but the biggest majority of them are not. * * *

"Q. Do you know how they got to be that way? * * * A. I would say, by checking these that it was done on the machine at the time they were doing the knurling."

At the request of plaintiff's counsel this expert witness examined several of the bolts which had been returned by defendant, and he testified that the knurls thereon were within the permitted diametral tolerance. However, in testifying relative to the difference between the bolts he examined, this expert said: "The knurls are not the same, but they could have been made from the same tool when the tool was sharp and the other ones where the tool was very dull or deformed." Enlarged photographs of several bolts chosen at

random indicated that they did not have a "sharp, fine, straight knurl" as shown by the specifications. During the trial defendant produced in court several thousand of the bolts it had attempted to use in condenser assemblies, and it offered plaintiff the opportunity to select and examine any of these bolts. It may be noted that plaintiff declined this offer. It may also be noted that in its telegram and letters subsequent to defendant's return of the 165,580 bolts as defective on November 6th, plaintiff did not deny that they were defective or claim that they conformed to the specifications. The statement of plaintiff's managing director as to material and labor conditions may well be considered in connection with the conflicting testimony as to the alleged defective condition of the bolts delivered. He said:

"Q. Now, will you please explain, as fully as you can, what difficulties, if any, there were that faced a manufacturer in the spring of 1946, in turning out an order of this kind? A. Well, in common with all metal fabricators, we were short of everything; we were short of tool steel. To make tools we were experiencing poor quality; we were short of raw material, that is, steel, to make bolts and screws from. We were short of labor, and we were plagued with the quality of everything from the tool steel to the raw material, and to the quality of the labor, and the productive force behind the labor that we employed, and by productive force I mean their ability to produce in accordance with schedule."

As the bolts in question were to be delivered f. o. b. at defendant's factory in Grand Rapids, Michigan, subject to final inspection, the contract should be construed and the rights and liabilities of the parties determined in accordance with the laws of that state. 55 C.J. page 214, sec. 167. Section 14 of the Michigan uniform sales act (2 Comp.Laws Mich.1929, sec. 9453, Stat. Ann. sec. 19.254) provides in part: "Where there is a contract to sell or a sale of goods by description there is an implied warranty that the goods shall correspond with the description."

The contract in the present case involved the sale of bolts which were to conform to certain specifications furnished by defendant, and under the above statute there was an implied warranty that they would conform to the specifications. If the bolts furnished by the plaintiff did not conform to the specifications, then defendant had the right to cancel the contract. Section 69 of the Michigan uniform sales act (2 Comp.Laws Mich. sec 9508, Stat.Ann. sec. 19.309) provides in part:

"(1) Where there is a breach of warranty by the seller, the buyer may, at his election: * * *

"(d) Rescind the contract to sell or the sale, and refuse to receive the goods, or if the goods have already been received, return them or offer to return them to the seller and recover the price or any part thereof which has been paid."

The evidence is convincing that a substantial number of the bolts delivered to defendant were not in conformity with the specifications. This constituted a material breach of the contract and entitled defendant to rescind, provided it gave notice of rescission within a reasonable time after receiving and inspecting the bolts. The testimony indicates that defendant was to use these bolts in a production-line assembly of radio condensers, and that it could not use any of them until it had received a sufficient quantity to enable it to begin production. Defendant's buyer testified that it had received a sufficient quantity to begin production in October, when it was discovered that they were not in conformity with the specifications. On November 6th defendant rejected and returned 165,580 bolts for the stated reason that the "dimensions were found to be out of drawing tolerance: * * * Knurl is tapered .001 also undersize from .001 to .002" On November 22d it wired plaintiff canceling the balance of its order.

Plaintiff argues that defendant did not inspect the bolts and rescind the contract within a reasonable time after receiving the first shipment of 370 on August 8th. Section 47 of the Michigan uniform sales act (2 Comp.Laws Mich.1929, sec. 9486. Stat.Ann. sec. 19.287) provides: "(1) Where goods are delivered to the buyer, which he has not previously examined, he is not deemed to have accepted them unless

and until he has had a reasonable opportunity of examining them for the purpose of ascertaining whether they are in conformity with the contract."

Section 69 of the Michigan uniform sales act (2 Comp.Laws Mich.1929, sec 9508, Stat.Ann. sec. 19.309) further provides: "(3) Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind."

In discussing this provision of the uniform sales act, it is stated in 46 Am.Jur. page 893, sec. 764, as follows:

"Under this and other similar statutes and at common law it is a well-settled rule that a buyer who has a right to rescind for breach of warranty must act promptly, that is, within a reasonable time under all the circumstances, after he has knowledge or is chargeable with knowledge of the breach of warranty; by an unreasonable delay the buyer is deemed to have affirmed the sale, and loses his right to rescind. * * * Under the Uniform Sales Act provision as to rescission for breach of warranty, it has been held that the 'reasonable time' within which a buyer must notify the seller of his election to rescind is to be determined by all the circumstances of the particular case, and not exclusively by the time when the breach should reasonably have been discovered. * * *

"The question as to what is a reasonable time for rescission of a contract is not an abstract question which can be answered merely by reference to a certain period of time, but depends on the particular circumstances, as the subject matter, the relation and location of the parties, their opportunities for communication, change in condition of the property or injury to the seller by delay, and any other factors which bear on the issue as to what should reasonably be expected or required. * * * In determining what is a reasonable time within which to rescind, consideration should be given to what is a reasonable time for inspection and testing of the goods, for a reasonable time within which to rescind includes a reasonable time for inspection and testing."

■ Defendant had the right to assume that the bolts would conform to specifications, and it could not reasonably be expected to inspect and test them until it had received a sufficient quantity to begin the assembling of condensers. It began its inspection early in October when it had a sufficient quantity on hand to begin production, and it then discovered that a substantial number of the bolts did not conform to specifications. It should be kept in mind that the small size and great number of these bolts made it impossible, or at least impracticable, to examine and measure each bolt as it was received or as it was used in the rapid assembly of condensers on a production line. Six bolts were to be inserted in each condenser, and employees on the production line could not take time to examine and measure each bolt and ascertain if it met specifications. It is apparent that if a substantial number were defective, none could be used. Under the facts and circumstances shown it appears that defendant made an inspection of the bolts within a reasonable time after receiving delivery from plaintiff.

■ The testimony indicates that defendant's business was highly departmentalized and that a decision to cancel the contract required the consideration and approval of several departments. As the testimony shows that plaintiff had stopped the manufacture of bolts on October 16th, pursuant to defendant's "hold" telegram of October 15th, it cannot claim that it was materially prejudiced by the fact that defendant did not give formal notice of cancellation until November 22d. Considering all the facts and circumstances, the court concludes that defendant's notice of cancellation was given within a reasonable time after it received and inspected the bolts and discovered that a substantial number did not conform to specifications.

■ The fact that defendant retained and paid for 34,020 of the bolts it had received from plaintiff, a part of which it had used in its inspection and examination and in establishing a production line, can-

not be construed as a waiver of its right to cancel the balance of the contract because of plaintiff's material breach thereof. Stearns Salt & Lumber Co. v. Dennis Lumber Co., 188 Mich. 700, 154 N.W. 91, 2 A.L.R. 638. In 12 Am.Jur. pages 1021, 1022, sec. 440 (and 1947 Cum. Supp. page 68, sec. 440), it is stated:

"A partial failure of performance is ground for the rescission of a contract, when such failure defeats the object of the contract, or when it concerns a matter of such importance that the contract would not have been made if default in that particular had been expected or contemplated.

"A material breach warrants rescission. There may be a rescission if there is a failure to perform a substantial part of the contract or one of its essential terms. * * *

"It has been said that if all parts of the contract are interdependent, so that one part cannot be violated without violating the whole, a breach by one party of a material part will discharge the whole at the option of the other party."

In Rosenthal v. Triangle Development Co., 261 Mich. 462, 246 N.W. 182, it is stated: "Rescission is permissible when there is failure to perform a substantial part of the contract or one of its essential items, or 'where the contract would not have been made if default in that particular had been expected or contemplated.' 1 Black on Rescission and Cancellation (2d Ed.) p. 553."

Plaintiff further argues that if the bolts it delivered did not conform to specifications, it was entitled to an opportunity to correct its mistake by delivering other bolts which would conform. In 46 Am.Jur. page 410, sec. 226, it is stated: "Where the contract requires the seller to furnish an article of a certain description by a specified time, and the article tendered by him does not meet the requirements of the contract, he has no right, after the time for delivery has expired, to remedy the defect in the article tendered or to tender another article complying with the requirements, and the buyer's refusal of such late tender is warranted and is not a breach upon the buyer's part." Citing American White Bronze Co.

v. Gillette, 88 Mich. 231, 50 N.W. 136, 26 Am.St.Rep. 286.

Under the terms of defendant's order the entire lot of 1,785,000 bolts was to be delivered by December, 1946. At the time of its "hold" telegram on October 15th, plaintiff had delivered only 199,600, a substantial part of which defendant claims were defective and not in accordance with specifications. As these bolts were to be used in production-line work, defendant could not be expected to hold up its production line while plaintiff replaced defective bolts. Under the particular facts of this case, the court concludes that defendant was not required to grant plaintiff further extensions of time within which to manufacture and replace bolts not in accordance with specifications.

In summary, the court finds that defendant examined the bolts received and discovered that a substantial number did not conform to specifications within a reasonable time after it received them, and that it gave notice of cancellation of the contract within a reasonable time after this discovery. It was entitled to cancel the contract because of plaintiff's breach of its implied warranty to deliver bolts conforming to the specifications shown by the drawing accompanying defendant's order of March 25th.

Turning now to plaintiff's claim of $23.54 for the duplicate lot of 22,000 wood screws, the court finds the following situation: On September 23, 1946, defendant wired plaintiff that it was "mailing" a purchase order for these screws, and on the same date it mailed the purchase order referred to in its telegram. When plaintiff received the telegram, it entered an order for the 22,000 screws, and when it received the purchase order by mail a few days later, it entered another order for the same number and kind of screws. It shipped 22,000, which defendant accepted and paid for. The question is whether or not defendant is liable for the duplicate lot of 22,000 screws which plaintiff manufactured and has on hand. Plaintiff argues that defendant was at fault in not indicating on the purchase order sent by mail that it was in confirmation of the telegram of

the same date. This argument is without merit. From its wording it is clear that defendant's telegram was not a purchase order but was merely a notification that it was "mailing" a purchase order. The telegram clearly indicated that it and the purchase order therein referred to related to one and the same order for screws. The only order that plaintiff was justified in entering was the purchase order sent by mail. Plaintiff was at fault in entering duplicate orders for the 22,000 screws, and it cannot collect the claim of $23.54 which resulted from its own mistake.

The court concludes that plaintiff failed to establish its right to recover any part of its claim asserted against defendant. Judgment of no cause of action will be entered for defendant.