Joe A. BOWEN and Mary
Bowen, Respondents,

v.

Bob FOUST d/b/a Foust Plumbing,
Heating & Cooling, Appellant.

No. 20320.

Missouri Court of Appeals,
Southern District,
Division Two.

May 2, 1996.

Daniel T. Moore, Poplar Bluff, for appellant.

Karen J. Miller, Spain, Merrell & Miller, Poplar Bluff, for respondents.

CROW, Judge.

Plaintiffs, Joe A. Bowen and Mary Bowen, sued Defendant, Bob Foust (doing business as Foust Plumbing, Heating & Cooling), for breach of contract.[1] The contract was made when Plaintiffs accepted Defendant's bid to sell and install certain heating and cooling equipment at Plaintiffs' home.

Defendant's bid specified four "RHEEM 3½ TON HEAT PUMP SYSTEMS" with a "SEER RATING OF 12." The bid price was $8,159, to be paid "WHEN INSTALLATION IS COMPLETE."

Plaintiffs pled that after paying Defendant the agreed sum, they discovered the equipment Defendant installed was not the equipment specified in the bid and was "incompatible with the existing system and [did] not operate properly."

The trial court heard the case without a jury and awarded Plaintiffs a judgment for $8,159, the specified price.

Defendant appeals, insisting the trial court erroneously ruled for Plaintiffs in that: (1) Plaintiffs failed to meet their burden of proof as to damages in that they "offered no evidence of the cost of repairing the defective work, or the diminution in the value of the home," and (2) Defendant was denied a reasonable opportunity to correct the defects under § 400.2–508, RSMo 1986, a provision of Missouri's "Uniform Commercial Code—Sales."

Our review is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (1996), as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1]. We view the evidence and permissible inferences therefrom in the light most favorable to the judgment, disregarding all contrary evidence and inferences, *Mehra*

*v. Mehra*, 819 S.W.2d 351, 353[2] (Mo. banc 1991), mindful that credibility of the witnesses and the weight to be given their testimony were matters for the trial court, which was free to believe none, part or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988).

So viewed, the evidence demonstrates that in early 1993, Plaintiffs' home had a Carrier heating and cooling system consisting of four outside units and four inside units. Plaintiffs decided to upgrade the system with equipment having a "12 seer rating" to "get more efficiency [so] the house [would] cool and heat better." Plaintiffs solicited and received bids on the project.

After Defendant's bid (dated March 24, 1993) was accepted by Plaintiffs, Defendant replaced the four outside units with Rheem units and replaced the coils in the four inside units. Plaintiffs' daughter, Karen Bowen, a realtor, acted as agent and overseer for Plaintiffs on the project. Karen's testimony included this:

"Q. Was there any discussion at that time as to whether or not the Rheem units were compatible with the Carrier unit that was inside?

A. Yes, ma'am.

Q. What did [Defendant] say?

A. He said they were compatible."

The record does not reveal when Defendant completed the project. However, Plaintiff Mary Bowen testified that around mid-July, 1993, "the compressor went out." Defendant removed it and ordered a replacement. Mary's testimony continued:

"Q. How long did it take you to get another compressor?

A. It took four to six weeks, which was—was the hottest part of the time.

Q. So most of the summer you were without air there?

A. Yes. Uh-huh.

Q. Were there ... any other problems?

---

1. Plaintiffs' breach of contract claim was the first count in a three-count petition. Plaintiffs abandoned the second count at trial, and the trial court ruled for Defendant on the third count. Defendant asserted a counterclaim against Plain-

tiffs. The trial court ruled for Plaintiffs and against Defendant on the counterclaim. The issues in this appeal pertain solely to Plaintiffs' first count.

A. Yes. The units leaked water all the time, and they frosted up like a Frigidaire would frost up in the house.

. . . .

Q. ... Were there problems with odors in the house?

A. Yes. Uh-huh.

Q. Dust?

A. Yes.

Q. During this period of time, did ... someone contact Mr. Foust? Did—Did someone come out there?

A. Yes, we called him all the time.

Q. And—

A. Probably about four or five months there and he kept telling us that he didn't understand ... why the pipes were freezing—

Q. He didn't know what to do to correct it?

A. Right."

Sometime that fall (1993) another compressor failed. According to Karen Bowen, the compressor was required for both cooling and heating.

In October, when Plaintiffs began needing heat, they discovered the system generated none. At that point, Defendant had not replaced the second compressor that failed.

In an effort to make the system produce heat, Defendant replaced the four inside units and presented Plaintiffs a bill for $1,400. However, according to Karen Bowen: "[W]e still didn't have any heat." Defendant then said "it was [Plaintiffs'] breakers." Karen testified Plaintiffs engaged an electrician to replace the breakers, which cost "200 and some odd dollars." Plaintiffs also installed new thermostats. Those measures also proved futile.

Around November 11, 1993, Defendant told Plaintiffs he had the compressor to replace the second one that had failed. However, he warned Plaintiffs it would not be under Rheem's warranty "if Rheem saw those [units]." Plaintiffs forbade Defendant from installing the compressor.

A few days later, at Karen Bowen's request, one Mike Johnson, a "heat and air man," examined the system installed by Defendant. Johnson's inspection revealed the system "did not have the 12 seer rating." Karen testified that upon learning this: "I called [Defendant] on the telephone and told him we wanted our money back and for him to come and get his units."

Asked how cold it was in the house that winter (1993–94), Karen recounted:

"It was cold enough that we put electric heaters in that house, and we heated the bathrooms with those water heaters. We heated—I brought every electric heater I had from my office and—and that I use in rental property and stuff like that for spares. And my dad wore his coat all the time. We stayed covered up with a blanket all the time. And we hauled wood to place in the fireplaces; it was that cold in that house."

In the spring of 1994, at Karen's request, Stanley Ray Buffington, a heating and cooling ventilation contractor and Carrier dealer, inspected the equipment installed by Defendant. Buffington found four Rheem three-ton units with a seer rating of 10.

Asked whether Carrier systems are compatible with Rheem systems, Buffington answered, "Absolutely not." He then explained why—an explanation we need not attempt to summarize. He also described several instances of substandard workmanship he observed in the installation of the Rheem equipment.

Buffington removed the Rheem units and replaced them with equipment that included heat pumps with larger tonnage and a 12 seer rating. He charged Plaintiffs "probably 15 to 18,000" dollars, which they paid.

Defendant insisted at trial, and maintains here: "It is clear this case involves the sale of 'goods' and is, therefore, governed by Missouri's version of the Uniform Commercial Code." Plaintiffs agree. We shall assume, without deciding, that the parties are correct.[2]

**2.** Vol. 1, White and Summers, *Uniform Commercial Code* (4th ed. 1995) § 1–1, explains that a

question can arise about whether Article 2 of the Uniform Commercial Code—the article cited by

Starting with that premise, we address Defendant's first point. As noted earlier, Defendant avers Plaintiffs failed to meet their burden of proof on damages when they presented no evidence of either the cost of repairing the defective work or the diminution in value of their home.

Defendant cites two cases in support of his first point. Neither case applies (or even mentions) any provision of the Uniform Commercial Code ("UCC"), hence neither case is helpful.

As we have seen, upon discovering that the equipment installed by Defendant did not have a 12 seer rating, Plaintiffs (through their agent, Karen) told Defendant to come and get the equipment and refund the purchase price. Plaintiffs maintain they had the right to do so under § 400.2–601, a section of Missouri's UCC.[3] That section provides, in pertinent part:

> "... if the goods ... fail in any respect to conform to the contract, the buyer may
>
> (a) reject the whole...."

Plaintiffs emphasize that the Rheem units sold to them by Defendant were "goods"[4] that failed to conform to the contract in that such units were three-ton units with a seer rating of 10, whereas the contract specified three-and-a-half-ton units with a seer rating of 12.

Plaintiffs recognize Defendant may argue that Plaintiffs accepted the goods even though they were nonconforming, hence § 400.2–601, above, does not apply. In that event, say Plaintiffs, § 400.2–608 granted them the right to revoke their acceptance. That section provides, in pertinent part:

> "(1) The buyer may revoke his acceptance of a ... commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

> (a) ...

> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

Plaintiffs assert they did not discover the nonconformity of the Rheem units until months after the units were installed. Furthermore, insist Plaintiffs, they did not know the Rheem units were incompatible with the existing Carrier system until Defendant, after months of futility, admitted "a man at Rheem had misinformed him and that those units were not compatible."

Plaintiffs point out that upon discovering the nonconformity they promptly notified Defendant that they were rejecting the Rheem units. Invoking the language of § 400.2–608(1), above, Plaintiffs add:

> "Under § 400.2–608, the buyer may revoke if the product's nonconformity 'substantially impairs' its value to him. Surely the value of a heating and cooling system is substantially impaired if it neither heats nor cools. Therefore, Plaintiffs should be entitled to their remedies under § 400.2–608."

The trial court made no findings of fact; consequently, we presume the trial court found all fact issues in accordance with

---

the parties here—applies in "hybrid" cases such as where a party undertakes to install a plumbing system in a house under construction and is also to provide the copper tubing. The transaction here was arguably "hybrid," as Defendant contracted to sell the Rheem equipment and install it. According to White and Summers, a majority of the courts apply Article 2 only if the "predominant purpose" of the whole transaction was a sale of goods. Readers interested in the

subject can find a discussion of it at pages 3–5 of the treatise.

3. Henceforth, references to sections of Missouri's UCC are to RSMo 1986.

4. Section 400.2–105(1) defines "goods" as: "... all things ... which are movable at the time of identification to the contract for sale...."

the judgment. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[3] (Mo. banc 1989).

■ We hold the evidence sufficient to support a finding that Plaintiffs' acceptance of the Rheem units without discovery of their nonconformity was reasonably induced either by the difficulty of discovery before acceptance or by Defendant's assurances. Inasmuch as such a finding is consistent with the judgment, we presume it was made. *T.B.G.*, 772 S.W.2d at 654[3].

Accordingly, Plaintiffs had a right to revoke their acceptance within a reasonable time after discovering the nonconformity. The evidence is sufficient to support a finding that Plaintiffs did so, and that they notified Defendant. As such a finding is consistent with the judgment, we presume it was made. *Id.*

The findings in the two preceding paragraphs trigger § 400.–2–608(3), above, which grants Plaintiffs the rights of a buyer who rejects goods upon delivery. Those rights are found in § 400.2–711. It provides, in pertinent part:

"(1) Where the ... buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, ... the buyer may cancel and whether or not he has done so *may in addition to recovering so much of the price as has been paid*

[Here, the statute grants the buyer additional rights and provides for situations not pertinent to this appeal. We omit those provisions.]

(3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession ... for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller...." (Emphasis added.)

The above statute specifically grants the buyer the right to recover "so much of the price as has been paid." Plaintiffs paid the entire price: $8,159. That was the amount awarded them in the judgment.

Because the damages awarded by the trial court are specifically authorized by § 400.2–711(1), above, we hold Plaintiffs were not obliged to present any additional evidence regarding damages. Accordingly, we find Defendant's first point meritless.[5]

Defendant bases his second claim of error on § 400.2–508, which provides:

"(1) When any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(2) Where the buyer rejects a nonconforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender."

Defendant argues that after November 11, 1993, Plaintiffs barred him from coming onto their property "to attempt to correct defects, further repair the system, or finish the job." According to Defendant, Plaintiffs could not "simply reject the goods ... without giving Defendant an opportunity to see whether he can make the goods conform to the contract within a reasonable time."

A careful reading of § 400.2–508, above, reveals it mentions only rejection of a nonconforming *tender* or *delivery*. There is no mention of cure by a seller after *revocation of an acceptance* by a buyer upon discovering that the goods are nonconforming. It is thus arguable that § 400.2–508 does not apply to the facts here.[6] However, it is unnecessary

---

**5.** We are not called upon to decide, thus we do not decide, whether Plaintiffs are entitled to collect the judgment, then resell the Rheem units and keep some or all of the proceeds. Disposition of the Rheem units—inferably still in Plaintiffs' possession at time of trial—is not an issue in this appeal.

**6.** According to White and Summers (footnote 2, *supra* ) § 8–5, pp. 466–67, until recent years most courts held the right to cure in § 400.2–508 did not apply in "revocation cases." Proponents of this approach argue this was intended by the Code's drafters and that the act of acceptance draws the line where the right to cure ends. *Id.* Newer case law and commentary show an in-

to decide that question in resolving Defendant's second point.

There were two fundamental problems in the transaction here.

First, the Rheem units were incompatible with Plaintiffs' existing Carrier system. This obstacle was evidently magnified by substandard workmanship in installing the Rheem equipment.

Second, the Rheem equipment failed to conform to the contract specifications regarding tonnage and seer rating.

We noted early in this opinion that Plaintiffs' purpose in undertaking the project was to upgrade the heating and cooling system and increase its efficiency. Their existing Carrier system had four three-ton units and, inferably, a seer rating lower than 12. Obviously, the specifications for four three-and-a-half-ton units and a seer rating of 12 were significant elements of the contract.

█ Even if we assume Defendant could have ultimately rigged the Rheem units to perform better than they had up to November 11, 1993—a confutable assumption—nothing in the record even remotely suggests that Defendant ever notified Plaintiffs he intended to deliver and install units conforming to the contract. A conforming delivery or tender is the "cure" authorized by § 400.2–508, above. The statute does not allow a seller to cure a nonconforming tender or delivery by making repairs or correcting substandard installation of equipment which, even if flawless, would not conform to the contract.

█ Because the equipment installed by Defendant would not have upgraded Plaintiffs' heating and cooling system to the intended level even had it performed satisfactorily, the trial court could have reasonably found—and presumably did, *T.B.G.*, 772 S.W.2d at 654[3]—that the nonconformity of the equipment installed by Defendant substantially impaired its value to Plaintiffs. Therefore, even if Defendant had a right to cure under § 400.2–508, the only acceptable

cure would have been to replace the equipment he installed with equipment conforming to the contract. As we have seen, Defendant never notified Plaintiffs, either before or after November 11, 1993, that he intended to do so.

Defendant's second point is denied, and the judgment is affirmed.

SHRUM, C.J., and PARRISH, J., concur.

---

creased willingness to allow the seller to cure after acceptance and before allowing the buyer to exercise the right to revoke. *Id.* However, according to 4 U.L.A. 63, *Uniform Commercial Code* (Cum.Supp.1995), the rule that a seller has no right to cure when a buyer justifiably revokes his acceptance remains the majority view.