Clara SMITH, by and through her Next
Friend, Jo Ann STEPHAN,
Respondent,

v.

AF & L INSURANCE COMPANY,
Appellant.

No. ED 83685.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 24, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 28, 2004.

Application for Transfer Denied
Nov. 23, 2004.

William P. Nacy, Jefferson City, MO, for appellant.

Mark A. Richardson, Jefferson City, MO, for respondent.

Before MARY R. RUSSELL, P.J., WILLIAM H. CRANDALL, JR., J., CLIFFORD H. AHRENS, J.

PER CURIAM.

AF & L Insurance Company ("Insurer") appeals from the judgment entered against it by the Circuit Court of Osage County, finding that it breached its long-term care insurance contract with Clara Smith ("Insured") and awarding her damages based upon her life expectancy and vexatious refusal to pay. We affirm in part and reverse and remand in part.

The parties do not dispute the underlying facts. Insured is a woman who was a month away from her 79th birthday when she applied for a replacement long-term care policy with Insurer in the fall of 1999. Her husband of 53 years had died five years earlier. After his death, she began to suffer for a period of time from situational depression.

Insurer's agent, Craig Walkenbach ("Agent") went to Insured's home in September 1999 to go over an application for long-term care insurance with Insured and her daughter, Jo Ann Stephan ("Daughter"). Insured was covered at the time by another long-term care policy from American Fidelity Assurance, which she had also purchased through Agent. The new policy was to replace the American Fidelity Assurance policy, which was scheduled to expire the following January.

Agent asked Insured questions and he wrote the answers on the application, which Insured then signed. In a section of the application entitled "Medical Information," question 4 asked, "[w]ithin the past [five] years, have you received any medical or surgical advice, examination or treatment for: ... b.) Parkinson's Disease, Stroke, Transient Ischemic (TIA), Epilepsy, Seizures, Alzheimer's Disease, Dementia, Senility, Forgetfulness, or any other Brain, Mental or Nervous Disease or disorder?" The "no" box next to this question was checked. The application reflected Insured was taking Paxil, and the

record on appeal indicates that this was prescribed in relation to the situational depression she had been suffering since her husband's death. Insured also provided Agent with an authorized release for her medical records from her physician, Peter Boyer, M.D., although Insurer did not review the records until after Insured's claim was filed.

Insured told Agent that she did not remember things like she used to. He asked her how her memory was and she stated that she was 79 years old and that she forgot things sometimes, such as where she put her car keys and the day of the week. Agent indicated that such lapses in memory were minor and asked about more serious issues. He asked Insured if she had ever been told she had Alzheimer's, dementia, "and some other things there." She replied she had not. He then asked Daughter the same question, to which she responded, "[n]o, I never was told that [Insured] had Alzheimer's or dementia or anything like that."

After the application was submitted to Insurer, another employee conducted an interview with Insured over the telephone later that month, and filled out a corresponding form entitled Personal History Narrative. It was Insurer's policy to conduct such interviews prior to issuing policies. A question on the form asked, "[d]o you have trouble remembering things?" The answer, as written by Insurer's employee, was "[n]o, except for minor forgetfulness."

In addition to questions addressing the same subject matter as the initial application, the Personal History Narrative also included a cognitive exam in which Insured was asked questions such as the names of the current and prior president and her telephone number. She answered correctly each question on the cognitive test. All

of Insured's other answers were consistent with the information provided in the initial application. She was accepted for coverage and received the policy, but was required to pay a higher premium because she had arthritis and was taking Paxil for mild depression and "nerves."

Insured paid her premiums for two years, totaling $8,533.38, until she moved to Westphalia Retirement Center on October 18, 2000. The reason for her admission was stated as "mood dementia osteoarthritis" with forgetfulness. Daughter filed a claim with Insurer on her mother's behalf, the receipt of which was acknowledged shortly thereafter. Subsequently, in correspondence dated December 27, 2000, Insurer indicated that it was seeking further information from Insured's health care provider, and that the claim would be processed upon receipt of that information.

The following January, Insurer declared the policy null and void, citing "lack of full disclosure on the application on which the policy was issued." The letter also indicated that, had there been full disclosure and the application questions been properly answered, the policy would not have been issued. Insurer returned to Insured a check in the amount of premiums paid, which she did not negotiate. Insured, by and through Daughter, filed suit alleging breach of the insurance contract and for statutory damages for vexatious refusal to pay.

At bench trial, Insurer offered the testimony of Jeffery Jones, its underwriting manager ("Underwriter"). He stated that the prescription for Paxil, disclosed on the application, would not cause further investigation because it is well-known in his field that someone who loses a loved one may suffer from situational depression. Underwriter testified, however, that if the answer to application question 4–b.) regarding memory loss and dementia had been "yes," he would have recommended that his company not issue the policy. He stated that, under Insurer's underwriting guidelines, individuals with Alzheimer's disease, dementia, or senility would not be accepted for coverage. When asked if forgetfulness factored into the decision to accept a risk, he replied, "[i]t does if it leads to one of those conditions." His testimony also established that minor forgetfulness is not grounds for denying an application. Rather, he indicated that forgetfulness is "such a common occurrence, and it's a well-known fact that that's not going to create a problem for us." Nevertheless, Underwriter responded in the negative when asked by the court if underwriters considered that people with forgetfulness may forget that they are forgetful.

On cross-examination, Underwriter acknowledged that he had not seen any medical records indicating that Insured had dementia or senility, nor was he aware of any such diagnosis prior to her admittance to Westphalia. He indicated, however, that had he been aware of Dr. Boyer's notation in Insured's medical records stating, "I wonder if this could be pseudodementia from depression," the application would have been rejected. Underwriter also provided the court with a definition of "post-claims" underwriting, which he stated occurs "if you didn't have all the pertinent information up front and then afterwards you went back and got the information."

The court also heard the testimony of Saul Rose, D.O., a licensed physician and consultant to Insurer, who had requested that he review Insured's medical records. He found no evidence of testing for dementia in her records. Moreover, Dr. Rose stated that there is no test for pseudodementia and that it is not a recognized condition, but a "descriptive" term used to describe a physician's impressions of what

may be a type of dementia. He noted, however, that the records indicated that Insured had taken Aricept for a "transient" memory problem related to anesthesia following her knee surgery in May 1999. Aricept is used to treat memory loss related to Alzheimer's disease. If Insurer had this information, he stated, the policy would not have been issued. This testimony was consistent with that of Insurer's claims supervisor. Dr. Rose also determined that, according to the medical records, Insured's memory loss was related to the situational depression she suffered since her husband's death and he acknowledged that "depression can have within it a component of minor forgetfulness."

Insured's medical records indicate that her memory problems vacillated between mild, improving, and extremely poor between May of 1998 and November of 2000. Dr. Boyer attributed the memory problems to depression she suffered after her husband's death. His notes from an examination of Insured about a week before she applied for insurance noted mild memory problems, but stated that her depression was resolved and that she was functioning normally.

The trial court found that Insured had made a prima facie case for coverage and that Insurer had vexatiously refused to pay under the policy. Judgment was entered in favor of Insured for $71,023.81 for past due benefits under the policy, $8,828.48 in prejudgment interest on that amount, $8,135.22 in statutory damages for vexatious refusal to pay, $15,000 in attorney's fees, and prospective coverage based upon Insured's life expectancy of 7.8 years and a 10% statutory penalty assessed on that amount totaling $249,590. The aggregate damage award was $352,577.51. This appeal follows.

Insurer raised three allegations of error. First, it alleges that the trial court erred in finding that Insured made no material misrepresentation on her application for insurance. Next it alleges error in the awarding of statutory damages and attorney's fees for vexatious refusal to pay. In its final point, it argues that the prospective award based upon Insured's life expectancy had no basis in the law.

■ Because this was a court-tried case, we follow the standard of review articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the judgment of the trial court unless it is against the weight of the evidence, it is not supported by substantial evidence, or it erroneously declares or applies the law. *Id.* Our review however, "is not undertaken with unfettered discretion." *Foster v. Vill. of Brownington*, 140 S.W.3d 603, 609 (Mo.App. W.D., 2004). Under Rule 84.13(d), we defer to the trial court's opportunity to judge the credibility of witnesses. Although we generally defer to the trial court's findings of fact, we review conclusions of law without deference to the trial court. *Kessler–Heasley Artificial Limb Co., Inc. v. Kenney*, 90 S.W.3d 181, 184 (Mo.App.2002). Our review of whether the trial court properly declared or applied the law to the facts presented is independent. *Ridgway v. TTnT Dev. Corp.*, 126 S.W.3d 807, 813 (Mo.App.2004).

In its first point, Insurer alleges that the trial court erred in finding that Insured had not made material misrepresentations on her application for insurance, and in finding that it had a duty to verify the truth of her averments on the insurance application. It argues instead that her misrepresentations barred her recovery under the policy. Insured argues that there was no misrepresentation, material or otherwise that would justify rescission.

■ The burden of proving that coverage exists falls upon the insured. *Trans World Airlines, Inc. v. Assoc. Aviation Underwriters,* 58 S.W.3d 609, 621 (Mo. App.2001). The insured establishes his prima facie case by showing: (1) issuance of the policy; (2) delivery of the policy; (3) payment of the premium; (4) the loss insured against; and (5) notice of loss and proof of loss given to insurer as the policy requires. *Shaffer v. Federated Mut. Ins. Co.,* 903 S.W.2d 600, 604–05 (Mo.App.1995) (quoting *Nixon v. Life Investors Ins. Co. of Am.,* 675 S.W.2d 676, 679 (Mo.App. 1984)). There is no dispute that Insured presented a prima facie case for coverage under her long-term care policy. The issue here is whether Insured was entitled to rescind the policy based upon Insured's alleged misrepresentation about her memory.

■ Misrepresentation is an affirmative defense and an insurer bears the burden of proof. *Cont'l Cas. Co. v. Maxwell,* 799 S.W.2d 882, 888 (Mo.App.1990). Missouri law allows an insurer "to avoid a policy when the application, containing a material misrepresentation, is incorporated by reference into and attached to the policy." *Id.* In *Continental Casualty,* the court described the insurer's burden. It stated:

> Missouri law requires the insurance company to demonstrate that a representation is both false and material in order to avoid the policy when (1) the representation is warranted to be true[;] (2) the policy is conditioned upon its truth[;] (3) the policy provides that its falsity will avoid the policy[;] or (4) the application is incorporated into and attached to the policy. Otherwise, the insurance company must demonstrate that the representation in the application was false and fraudulently made in order to avoid the policy.

*Id.*

■ In determining materiality, the inquiry is not whether the misrepresentation actually affected the insurer's decision, but whether "it would have influenced a reasonably careful insurance company's decisions concerning the acceptance of risk and what premium to charge[.]" *Adams v. Columbia Mut. Ins. Co.,* 978 S.W.2d 10, 11 (Mo.App.1998). A misrepresentation is material if an insurer, "acting reasonably and naturally in accord with [its] custom and practice, would have relied on the representation." *Id.*

Our statutes further define the nature of misrepresentations made in the procurement of insurance. Sections 376.580 and 376.800 RSMo 2000[1] cover life, accident, and health insurance contracts, respectively. They provide that no misrepresentation shall be deemed material or render a policy void unless the matter misrepresented actually contributed to the event triggering the policy's benefits. Sections 376.580 and 376.800.[2] From our statutory

---

1. All further statutory references are to RSMo 2000 unless otherwise indicated.

2. Although inapplicable to this case, our legislature enacted Sections 376.1100 through 376.1130 in 2002, which deal with long-term care policies. The purpose of the sections is:
 > to promote the public interest, to promote the availability of long-term care insurance policies, to protect applicants for long-term care insurance, as defined, from unfair or deceptive sales or enrollment practices, to establish standards for long term care insurance, to facilitate public understanding and comparison of long-term care insurance policies, and to facilitate flexibility and innovation in the development of long-term care insurance coverage.

 Section 376.1103 RSMo Supp.2002.
 Section 376.1124 deals specifically with rescission of long-term care policies due to misrepresentation. It states in part:
 > For a policy or certificate that has been in force for at least six months but less than

provisions, it is clear that the subject matter of the alleged misrepresentation must be related to the event for which the claim was ultimately filed.

The application Insured signed stated:

The undersigned applicant and agent state that the applicant has read, or had read to him/her, the completed application and that the applicant further understands that failure to reveal complete information about existing health conditions and/or any missing and/or inaccurate information or fraudulent statement in the application may result in loss of coverage under the policy.

Therefore, in order to establish its defense, Insurer need only prove that Insured's representations were false and material. *Hite v. Am. Family Mut. Ins. Co.*, 815 S.W.2d 19, 22 (Mo.App.1991).

 We first address whether the representations on the application were false. *Id.* Insured and Agent filled out the application for a long-term care policy on September 8, 1999. She had seen Dr. Boyer a week before on August 30, 1999.[3] In that visit, he noted that she had only "mild" memory problems, her depression was "resolved," and she was functioning "completely normally." Almost two months prior, on July 1, 1999, Dr. Boyer acknowledged that Insured was suffering from extremely poor memory that may have been getting worse. He indicated that she had been hospitalized and had been doing physical therapy following her knee surgery. She had also been taking Aricept for "transient" memory problems related to anesthesia used in surgery, but Dr. Boyer took her off of this medication. Moreover, in a letter to Insurer in February 2001, Dr. Boyer stated that Insured did not have Alzheimer's disease and that her mental status was normal. He stated that transient memory loss due to anesthesia was treated with Aricept. None of the medical records address *treatment* for memory loss although the records acknowledged memory improvement from treatment for depression.

Insurer claims that if it had notice that Insured had been taking Aricept, it would have denied her application and not issued a policy. We find, however, that Insured was prescribed Aricpet in relation to her knee surgery and that the prescribing physician was not Dr. Boyer, her primary provider. Although the record is unclear as to exactly how long Insured was taking the medication, it is clear that her knee surgery occurred in May 1999. Dr. Boyer saw her on July 1, 1999, and, at this appointment, he determined that she was taking too many medications, and took her off the drug. Insured took Aricept only for a few weeks. When she was taken off of it, her condition improved. Moreover, she was not taking the drug in relation to dementia. Instead, it was used to a treat a memory problem associated with anesthesia. Blanket denial of an application for this medication leaves no margin of error and would withhold coverage for an

---

two years, an insurer may rescind a long-term care insurance policy or certificate, or deny an otherwise valid long-term care insurance claim upon a showing of misrepresentation that is both material to the acceptance of coverage and which pertains to the conditions for which benefits are sought. Section 376.1124.2 RSMo Supp.2002.

Additionally, we note the presence of Section 376.1109.2(1), which states:

No long-term care insurance policy may: (1)[b]e cancelled, nonrenewed or otherwise terminated on the grounds of the age or the deterioration of the mental or physical health of the insured individual or certificate holder[.]
Section 376.1109.2(1) RSMo Supp.2002

3. The record on appeal contained only certain medical records from the period of February 8, 1996, through October 10, 2000.

insured who was placed on a medication for any length of time, by any physician. Such a practice would deny coverage for any person who has ever been misdiagnosed or over-medicated. In light of these circumstances, the presence of Aricept in Insured's records is not indicative of treatment for dementia, Alzheimer's disease, or forgetfulness, nor does it suggest she misled Insurer.

Insurer cites *Hite* in support of its argument that "[e]ven if [Insured's] contentions were innocently made, they are indisputably false in that her medical records clearly and unequivocally state that she *suffered from poor memory* for well over a year before she applied for insurance with [Insurer]." (emphasis added). This contention is incorrect. Both Agent and Daughter testified that Insured told Agent that her memory was deteriorating. Daughter recalled that Agent had asked whether Insured had been diagnosed with various neurological disorders, which she had not. During Agent's trial testimony, he stated that Insured indicated that she didn't remember things like she used to, a statement that did not result in him checking "yes" next to the question which asked whether the applicant has been treated for various neurological disorders. Instead, he stated, when an applicant reports poor memory, he then "would ask if they're under treatment or medicated for that." Insured's stating that she was not being medicated or treated for forgetfulness was consistent with the medical records. Moreover, Underwriter stated in an affidavit that "minor forgetfulness" was not a barrier to coverage, *particularly in the senior market.*

We also take into account Underwriter's statement that forgetfulness may factor into underwriting if it leads to Alzheimer's disease, dementia, and senility. This statement acknowledges some degree of post-claims underwriting in the senior market, and we find this practice unacceptable. Insurer's hindsight was very convenient when faced with liability for Insured's claim. *See Liberty Life Ins. Co. v. Schaffer,* 660 F.Supp. 114, 118 (E.D.Mo. 1987), *aff'd in part, rev'd in part,* 853 F.2d 591 (8th Cir.1988).

Dr. Boyer treated Insured for situational depression. She was not treated for memory loss. In fact, when Dr. Boyer took her off Aricept, her memory improved as her depression lessened. In her most recent visit to her doctor prior to applying for the long-term care policy, she complained of only "mild" memory problems, consistent with her admission to Agent that she was forgetful. Insured's statements that she was not being treated for dementia, senility, or forgetfulness, were not rendered misrepresentations by the fact that the medication prescribed for her depression, Paxil, alleviated her forgetfulness.

Insurer discusses the term pseudodementia as a diagnosis for brain disease for which Insured received treatment. This argument mischaracterizes the evidence. Insurer's own witness acknowledged that pseudodementia was not a recognized medical condition. Additionally, the term was used once in Dr. Boyer's records when he stated, "I wonder if this could be pseudodementia from depression...." This statement was not a diagnosis. It was merely a thought for his reference. If we were to interpret this statement as a diagnosis, as Insurer suggests, it would penalize patients by denying them eligibility for coverage based on impressions, not diagnoses, contained in their medical records.

We find that Insured's representations were not false. In light of this conclusion, we need not determine whether they were material, nor do we need to determine whether the representations were related

to the condition that ultimately led to the filing of the claim.

Forgetfulness, unlike medical diagnoses, is an extremely subjective concept. We agree with the trial court's finding that the "contrast between the post claims review process and all its rigidity with the looseness of the underwriting process of [Insurer] when the application was reviewed is remarkable." As such, we find, as did the trial court, that Insured made no misrepresentation, material or otherwise, on her application for coverage.

■ Insurer also takes issue with the trial court's finding that Insurer failed to use due diligence to investigate Insured's medical history. It states that that there is "no case in this nation" where an insurer has been required to verify information on an application, and indeed, we acknowledge that insurers generally are not required to make further inquiry where the application is complete on its face. *See Moreland v. State Farm Fire and Cas. Co.,* 662 S.W.2d 556, 566 (Mo.App.1983). This situation is distinguishable, however, because Insurer did in fact inquire beyond the application.

Underwriter stated on examination by the court that the decision to request medical records is within each underwriter's discretion and depends upon "what they're getting from the application and from the telephone interview." The personal history narrative included a basic cognition test, which Insured passed, answering each question correctly. Her ability to successfully complete this test was consistent with her physician's statements of August 1999 that she was functioning "completely normally." Finding for Insurer in this in-

stance would penalize Insured for Insurer's underwriter's failure to exercise its discretion and we will not do so. Insured will not be penalized where lax underwriting standards, such as discretionary review of medical records, give way to rigid claims review.

■ Insurer's argument also mischaracterizes the nature of Insured's medical history and treatment. Throughout its brief, Insurer continually refers to Insured's "diagnosis and treatment" for poor memory. These terms are misused. "Poor memory" and "forgetfulness" are not medical diagnoses, rather they are subjective symptoms, which, Insurer acknowledged, are common among the senior population. Nor do the records suggest that Insured was "treated" specifically for any memory problems. Insured's diagnosis was for situational depression which led to forgetfulness. Her treatment was for depression. The fact that her memory improved while being treated for depression was a collateral benefit. We find Insurer wrongly rescinded its policy with Insured.[4] Point one denied.

In its second point, Insurer argues that the statutory award for damages of $8,135.22 and attorney's fees in the amount of $15,000 for vexatious refusal to pay was in error because it presented a valid defense in good faith. It argues that it was entitled to judicial determination of its liability without incurring a penalty.

There are two statutory provisions relevant to this discussion. Section 375.296 authorizes damages for vexatious refusal where an insurer refuses to pay a claim after 30 days and it appears from the

---

4. Rescission is unwarranted where there is no fraud or misrepresentation. *See Osterberger v. Hites Constr. Co.,* 599 S.W.2d 221, 227 (Mo. App.1980) (stating that rescission may be based on a false representation of a material fact, made with the knowledge of its falsity and with the intent to deceive, or upon a false representation or a concealment made innocently as a result of a misapprehension or mistake).

evidence that the refusal was vexatious and without reasonable cause. Section 375.420 also describes vexatious refusal to pay. It states:

> In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employer's liability, burglary, theft, embezzlement, fidelity, indemnity marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

■■■■■ As this section is penal in nature, we construe it strictly. *Mears v. Columbia*, 855 S.W.2d 389, 394 (Mo.App. 1993). Although the statute's purpose is to compel insurers to deal in good faith, it should not be construed in a way to inhibit bona fide defenses. *Crewse v. Shelter Mut. Ins. Co.*, 706 S.W.2d 35, 46 (Mo.App. 1985) (Dixon, J., dissenting). In order to receive damages under the statute, an insured must prove that insurer's refusal to pay was willful and without reasonable cause as it would appear to a reasonable and prudent person. *JAM Inc. v. Nautilus Ins. Co.*, 128 S.W.3d 879, 897 (Mo.App. 2004). This determination is based upon a "general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." *DeWitt v. Am. Family. Mut.*, 667 S.W.2d 700, 710 (Mo. banc 1984). An insurer's ultimate liability under the policy is not determinative of whether the refusal was vexatious. *JAM*, 128 S.W.3d at 897. Rather, this determination must be based upon the facts present at the time the claim was filed under the policy. *Id.* at 897–98.

■■■■ An insurer may question or contest its liability "if it has reasonable cause to believe, and does believe, that it has no liability under the policy and that it has a meritorious defense." *Id.* at 898. The presence of a litigable issue, however, does not preclude imposition of the statutory penalty where there is evidence that the insurer's attitude was vexatious or recalcitrant. *DeWitt*, 667 S.W.2d at 710. The fact finder may consider, among other things, the insurer's reason in denying the claim. *JAM*, 128 S.W.3d at 898. The insurer's justification for denying the claim must be reasonable. *Russell v. Farmers & Merch. Ins. Co.*, 834 S.W.2d 209, 221 (Mo.App.1992).

■■■ When Insured's first claim under the policy was filed, she was 80 years old and had been admitted to a long-term care facility for dementia and osteoarthritis. Initially we note that, given that Insured was elderly, denial of her claim on the basis of forgetfulness was not for reasonable cause, as it would appear to a reasonable and prudent person. Insurer provided truthful information on her application, and submitted to a follow-up interview, and successfully completed Insurer's cognitive exam. Moreover, insisting that Insured misled Agent when she acknowledged her memory problem at the application stage and made her medical records available, suggests post-claims underwriting.

In this case, Insurer's actions at the time the policy was issued are also relevant. Insurer's underwriting guidelines addressed replacement policies and required that, where a policy is issued to

replace another, the application must be accompanied by a Replacement Form and Comparison Form.[5] Daughter testified that when Insured and Agent filled out the application for Insurer's long-term care policy, he explained the differences in the two policies including features in the new policy that were not present in the American Fidelity long-term care policy, which the new policy replaced. Neither Daughter nor Agent recalled whether a replacement form had been executed. After applying for and receiving coverage under Insurer's long-term care policy, Insured allowed the American Fidelity policy to lapse.

Insurer did not adhere to its protocol in issuing the new policy, allowed the effective policy to lapse, and then claimed misrepresentation and rescinded the new policy. It acted in contravention of its guidelines, allowing Insured's existing policy to lapse in reliance that her risk would be covered by the new policy, and then denied coverage under the new policy. Such a practice defeats Insurer's claim that it had a meritorious defense. Additionally, given Insured's current health, she will be unable to procure long-term care insurance coverage from another source. In light of these facts, we find Insurer's actions were vexatious and recalcitrant.

■ Next we address the award of attorney's fees under Sections 375.296 and 375.420. To recover attorney's fees for vexatious refusal to pay, an insured's claim must be supported by pleadings and sustained by proof. *Russell*, 834 S.W.2d at 223. Although Insurer argues that the award of attorney's fees was in error, its assertion was not supported by authority or argument. Insured's request for attorney's fees was properly pled and supported by exhibits. We conclude the award was not in error.

The trial court's award of statutory damages and attorney's fees for vexatious refusal to pay is affirmed. Point two is denied.

In its third point, Insurer argues that the trial court erred in awarding Insured damages based on her projected life expectancy of 7.8 years. The trial court awarded Insured $249,590 in accelerated damages based upon her life expectancy of 7.8 years at the time of the trial. This sum was arrived at by reducing to the present value the amount of benefits due Insured under the policy at a rate of $90 per day multiplied by her life expectancy, plus a statutory penalty of ten percent. Insurer asserts that there was no legal basis for this remedy in a breach of contract action. Additionally, it alleges that there is no legal basis for the "statutory penalty of 10 percent" of the life expectancy award.

■ The purpose of a breach of contract action is to restore the non-breaching party to the position she would have occupied had the breaching party fully performed on the contract. *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo.1970), *questioned on other grounds by Sands v. R.G. McKelvey Bldg. Co.*, 571 S.W.2d 726 (Mo.App.1978). In a breach of contract action, however, the law cannot elevate the non-breaching party to a better position

---

**5.** The guidelines state, "[I]f replacement is indicated on a new application, it must be accompanied by a Replacement Form and Comparison Form." The application at issue states that Insured had another long-term care policy in place. The question regarding replacement coverage states, "Do you intend to replace any of your *medical or health* insurance coverage with this policy?" (emphasis added). Next to this questions, the "no" box is checked. Moreover, the American Fidelity policy is not listed in the section directing Agent to list all long-term care policies "which the applicant has or had."

than she would have enjoyed had the contract been completed on both sides. *Id.* While we appreciate the trial court's desire to guarantee that Insured is compensated for her long-term care expenses as bargained for in her insurance policy, an award based on Insured's life expectancy provides her relief beyond that available in her breach of contract action.

The issue of prospective payments in insurance breach of contract cases is rarely addressed in our case law. In *Allen v. National Life & Accident Insurance Company*, the insured alleged that she was permanently disabled. 228 Mo.App. 450, 67 S.W.2d 534, 534 (1934). Her policy specified that she was entitled to benefits for 26 weeks per year that she was disabled. *Id.* When the insurer repudiated the contract, she sued for damages based upon her life expectancy. *Id.* The reviewing court reversed the trial court, finding the damages based upon life expectancy too speculative. *Id.* at 534. Similarly, in another case involving disability benefits, this court agreed with the trial court's finding that insured's "request for immediate payment of future monthly benefits based upon [insured's] reasonable life expectancy does not state a claim upon which relief can be granted." *Dyer v. Gen. Am. Life Ins. Co.*, 541 S.W.2d 702, 706 (Mo. App.1976).

Although a liquidated prospective damages award would best protect Insured from Insurer's proven unwillingness to provide her coverage, we agree with Insurer that an award based on Insured's life expectancy is impermissibly speculative. In the context of insurance, such an award might allow Insurer to escape liability for years that Insured lives beyond her life expectancy, or might permit Insured or her estate to recover excess funds should she die before the calculated life expectancy. *See Allen,* 67 S.W.2d at 535. Insured cannot recover payments under the insurance contract which, by reason of her death or recovery, might never accrue. *See id.*

As discussed above, however, Insurer wrongly rescinded Insured's policy because she did not make any material misrepresentations to Insurer, and she is entitled to past coverage. Like any improperly rescinded contract, Insured's policy with Insurer remains in full force and effect. *See Jetz Serv. Co., Inc. v. KC Citadel Apartments, L.L.C.,* 59 S.W.3d 527, 530 (Mo.App.2001). As such, Insurer is required to perform the contract according to its terms for as long as Insured qualifies for coverage under the policy. It is through this ongoing performance of the contract that Insured should receive the coverage benefits owed to her, and we find no authority suggesting that she should instead receive a prospective damage award based on her life expectancy.

■ Insurer argues that continued payment of premiums is required for awarding future damages. From our review of the policy, however, we find that Insured is entitled to receive continued benefits regardless of continuing payment of premiums. The section entitled "Waiver of Premium Benefit" states:

Once [y]ou have received benefits for ninety (90) consecutive days under the Assisted Living Facility benefit or Nursing Facility Benefit, or have received benefits for ninety (90) consecutive days or more on a regular basis for Homemaker/Companion Care or Home Health Care, (a regular basis is five (5) days or more per week), [w]e will waive the payment of premiums coming due for this Policy and any riders attached to this policy while [y]ou continue to be eligible for the benefit. Premiums will become payable immediately when you are no

longer eligible for the Waiver of Premium Benefit.

Based upon the language of this section, Insured is entitled to coverage under the policy until she no longer requires assisted living.

Insurer also contests the award of the statutory penalty on the life expectancy amount under section 375.420. In light of the fact that we have found the life expectancy award in error, however, the statutory penalty on that amount necessarily fails.

We reverse the trial court's award of $249,590 and remand to the trial court for entry of a judgment in accordance with this opinion.

The judgment is affirmed in all other respects.