**FAR EAST SERVICES CORP., and D & W Sales, Inc., Plaintiffs/Appellants/Respondents,**

v.

**TRACKER MARINE, L.L.C., Defendant–Third Party Plaintiff/Respondent/Cross–Appellant,**

v.

**Joel Detwiler, Counterclaim Defendant/Respondent.**

**Nos. 27829, 27847.**

Missouri Court of Appeals, Southern District, Division Two.

Dec. 3, 2007.

Motion for Reconsideration Denied Dec. 26, 2007.

---

Tim Gammon, Springfield, for plaintiffs/appellants/respondents Far East Services, Corp. and D & W Sales, Inc., of MO.

Bryan O. Wade and Ginger K. Gooch, Husch & Eppenberger, L.L.C., Springfield, MO, for defendant-third party plaintiff/respondent, cross-appellant Tracker Marine, L.L.C.

Stuart H. King, McDonald & Hosmer King Royce, P.C., Springfield, MO, for counterclaim defendant/respondent Joel Detwiler.

GARY W. LYNCH, Judge.

The two principal parties to a series of transactions revolving around the manufacture and sale of goods cross-appeal the

trial court's judgment alleging altogether fourteen points of error. Only finding merit in one point, we reverse and remand that portion of the judgment awarding damages plus prejudgment interest for engineering services related to those goods. In all other respects, the judgment is affirmed.

### (1) Factual Background

Plaintiffs D & W Sales, Inc., a Missouri corporation, d/b/a Far East Services, and Far East Services, a corporation authorized to do business in, and in good standing under the laws of the Cayman Islands (collectively "Far East"), conducted business in Missouri through its agents, D & W Sales, and Far East Services and its owner and agent, Robert Minor ("Minor"). Defendant Tracker Marine, LLC ("Tracker") is a Missouri limited liability company, whose principal place of business is in Greene County, Missouri.

During all relevant time periods Tracker had five production plants, all of which make different types of boats at different rates of production. The plants in Bolivar and Lebanon, Missouri, make aluminum boats and use the most fasteners. Tracker's other plants were in Ozark, Missouri; Clinton, Missouri; and Murfreesboro, Tennessee.

Joel Detwiler was in Tracker's employ from August 14, 2000, through August 31, 2001. His office was in Tracker's corporate headquarters in Springfield, Missouri. At the time Detwiler was hired by Tracker, he executed an Associate Agreement which required him to keep confidential certain defined information concerning Tracker.

Upon being hired, Detwiler was directed to address the investigation of overseas purchasing, the consolidation of materials management at Tracker's corporate office, and the implementation of a quality-control process similar to that used in the automotive industry, which process would include a pre-production approval process ("PPAP"). Also included within his responsibilities was the oversight of inventory control, transportation functions, accounts-payable functions, and some product warranty issues. Detwiler's management authority with respect to the purchasing of materials included the oversight of Tracker employees Janet Jones and Steven Spencer.

During a meeting at the Clinton, Missouri plant in November of 2000, the president of Tracker, Ken Burroughs, specifically identified the purchasing of fasteners as a problem, based upon an excessive number of vendors being used by Tracker, an excessive number of warranty claims based upon failed or rusted fasteners, and the opportunity for cost savings through overseas purchasing.

Detwiler and his supervisor, Jack Wagner, determined that the most appropriate way to initiate the increased purchase of materials from overseas suppliers was to create drawings of the materials used by Tracker, which drawings would include the drawing of the part, its dimensions, and the specifications to which the part would be manufactured. Tracker did not have personnel with both the expertise and time to create these drawings.

Detwiler and Minor were acquaintances before Detwiler was hired at Tracker. After taking the Tracker job, Detwiler contacted Minor to see if Minor could help, as Tracker was having problems with boat returns, rusting fasteners, fastener supplier quality, and delivery. This contact also included an inquiry as to Minor's interest in both preparing the drawings of Tracker parts and submitting proposals to supply parts to Tracker.

Detwiler and Minor agreed that Far East would implement a PPAP for any parts Tracker ordered. As part of that process, Far East would provide Tracker with drawings and first-piece inspection reports with samples attached for review and approval by Tracker's engineers before any parts were manufactured. Far East agreed to be responsible for including all necessary information on the drawings, and Far East had the responsibility to research the engineering issues it could not independently resolve. Detwiler and Minor agreed that Tracker must approve the drawings and first-piece inspection reports before parts were manufactured. Sometime before the end of January 2001, Tracker and Far East reached an agreement whereby Far East agreed to prepare the drawings required by the PPAP at an hourly rate of $50.00, with a monthly cap of $3,500.

In order to effectuate the process of preparing these drawings, Detwiler introduced personnel of Far East, including Minor and Mike Giebel, to Tracker personnel at the various Tracker plants, including the plant "engineers." Detwiler further made arrangements for Far East to take possession of samples of each of the parts for which it was to prepare a drawing. Detwiler also provided to Far East a fastener reference guide[1] to lend Far East assistance in determining appropriate materials and specifications. The process of gathering parts as necessary to prepare drawings went on at least through March of 2001. This process also included Detwiler providing Giebel lists of parts, annual usages, and target costs.

Detwiler expected Far East to reverse engineer the parts in order to obtain the necessary information to be included on the drawings and to provide a price quote. Far East had metallurgical analyses performed on some of the samples. Tracker knew that the parts it was currently using (the pool from which Far East took the samples) met quality specifications for corrosion and other relevant factors.

Giebel delivered the parts samples and the other information provided by Detwiler to Mighty AA and NationsBond, foreign corporations Far East contracted with to draw and manufacture fasteners and other parts. Giebel had these potential manufacturers and Jason Hargis, whom he hired, prepare initial drawings. Over 150 drawings were prepared or reviewed by Giebel and then submitted to Tracker. Giebel holds an engineering degree, but he is not a licensed engineer.

Upon receipt of drawings from Far East, Detwiler directed that copies be made of each drawing and forwarded to the plant "engineers" for review and approval. Most drawings were forwarded to the engineer at the Bolivar, Missouri plant at the direction of Jack Wagner, because this engineer had prior experience in the automotive industry and was generally familiar with the PPAP process. Detwiler did not personally follow up with the plant engineers with respect to approval or rejection of the drawings.

No drawing was ever approved or signed by an engineer or other employee of Tracker. According to the terms of the PPAP agreement between Tracker and Far East, the parts should not have been manufactured or shipped absent such approval.

Tracker internally issued written purchase orders for Far East's engineering services in preparation of the drawings although they were not delivered to Minor or Far East. Tracker paid two or three of Far East's invoices for these services total-

---

1. O.M. Corporation, Kanebridge Fastener Reference Guide, 2d Edition (1998).

ing $20,500, leaving a balance of $6,750 for unpaid services.

In addition to the agreement with Far East regarding the preparation of drawings, Detwiler also had discussions with Minor regarding Far East submitting quotes to supply parts, including fasteners, to Tracker. In order to allow Far East to submit quotes on parts, Detwiler either provided or directed Tracker's purchasing agents to provide to Far East anticipated yearly usages of the subject parts and "target prices" for the subject parts. Far East submitted price quotes for various parts to Tracker on or about January 30, February 23, and March 5, 2001.

Upon receipt of quotes from Far East, Detwiler directed Steven Spencer to prepare analyses comparing the cost of the parts quoted by Far East to the cost being paid by Tracker to its current suppliers. Based upon these analyses showing a cost savings, Tracker, by and through its purchasing agent Spencer as approved by Detwiler, issued its purchase order T26411 on February 6, 2001, for a portion of the parts quoted by Far East on January 30, 2001, in the amount of $165,205.46. This purchase order specifically included the terms that the parts would be "FOB Destination" and would be "Vendor Warehouse for Release as Needed."

Tracker, by and through its purchasing agent Spencer and approved by Detwiler, issued its purchase order T26428 on March 9, 2001, for a portion of the parts quoted by Far East on February 23, 2001, in the amount of $117,946.02. This purchase order also specifically included the terms that the parts would be "FOB Destination" and would be "Vendor to Warehouse for Release by Tracker." Purchase order T26428 was then corrected or modified by Tracker on or about March 23, 2001, to reduce the amount of the order to $91,836.02. The corrected purchase order again included the terms that "all prices are FOB Tracker Marine" and "Vendor to Warehouse Items at their Facility for Release by Tracker."

The circumstances surrounding the final purchase order are less clear. What is apparent from the record is that Far East submitted a quote on or about March 5, 2001. The initial cost analysis by Spencer on this quote indicated a savings of $12,700 to Tracker. Exhibit B–6 indicates that there was a purchase order prepared on March 7, 2001. However, no party offered this purchase order for admission into evidence, and its contents are unknown.

Thereafter, on March 23, 2001, Detwiler executed a document purporting to be a revision to the March 7, 2001 purchase order in the amount of $198,027.76. The revised purchase order, bearing number T26429, specifically stated that there would be "no tooling charged." Although the March 23, 2001 revision included no "vendor warehouse" language, there is no evidence from which it can be determined whether such language—or any other shipping instructions—were included in the purchase order which was prepared on March 7, 2001.

The purchase order dated March 23, 2001, numbered T26429, contains no shipping instructions and was signed only by Detwiler. The purchase order contains an unsigned signature block above the words "Approved by Executive Officer" and says "THIS ORDER NOT VALID UNLESS SIGNED BY AN EXECUTIVE OFFICER." Detwiler was not an executive officer, but rather the preparer of this purchase order. An Executive Officer (e.g., Jack Wagner, Detwiler's boss) needed to sign the purchase order for it to be valid. While the purchase order does not contain shipping instructions, Detwiler and Minor agreed that Far East would warehouse the parts until Tracker released them on an

as-needed basis. That agreement was never modified orally or in writing, and no one at Tracker ever communicated to Far East that the parts reflected on this purchase order should be released.

An additional step or requirement of the PPAP was that Far East would submit "first pieces" of the manufactured parts to Tracker for inspection and approval. Only upon Tracker's inspection and approval of the first pieces would Far East be free to produce the parts.

During April and May 2001, Giebel received first-piece inspection reports and samples from Far East's overseas suppliers. Giebel did not submit to Tracker all first pieces for inspection, because he erroneously understood that he had authority to approve the parts. No first-piece inspection was ever approved or signed by an engineer or other employee of Tracker.

In May 2001, parts identified on the purchase orders were produced in and sent from China to Marco Group, the company Far East employed to warehouse and "debulk" the parts. The first parts produced, under purchase order T26410, were picked up by Minor from Marco and delivered to the Murphysboro plant. Tracker paid for these parts, and they are not involved in this litigation.

On July 30, 2001, Far East shipped eight pallets of parts to Bolivar, six pallets to Lebanon, thirteen pallets to Clinton, and four pallets to Ozark. The shipments received on this date were in partial fulfillment of purchase orders T26411 and T26428. Tracker did not request or authorize the shipment of these parts.

The parts delivered on July 30, 2001 ("the July parts"), should have previously been entered into Tracker's central inventory system, which kept track of the quantities of parts available from suppliers so the plants could order them. But Detwiler

never put these parts into the central system, nor did he tell Jones or anyone else to do so. Under Tracker's standard operating procedure at that time, Tracker's buyer had the responsibility to enter purchases into the system. The only two "buyers" at headquarters at the time were Spencer and Jones. Spencer did contact the Murphysboro plant about the torxhead screws included in purchase order T26410, but he did not contact any of the plants about the year's supply of parts on purchase orders T26411, T26428, and T26429. Jones knew and told Detwiler these parts needed to be entered into the central system so the plants would know about them, but Detwiler told her not to put them in the system. Jones went to Jack Wagner (Detwiler's boss) about it, and he said he would take care of it, so she did not follow up to see that it was done. Only after the parts were delivered did Jones realize it was never done.

When the six pallets of the July parts arrived at Lebanon, those parts having never been entered in Tracker's central system, an e-mail was sent from the Lebanon plant to Tracker headquarters asking what to do with them. That e-mail was given to Detwiler, but between then and when he left Tracker's employ, nothing was done. Detwiler did not contact Minor about that delivery, and no one from Tracker contacted anyone from the shipper, Marco, or Far East prior to Detwiler's termination of employment by Tracker on August 31, 2001.

On September 7 and 16, 2001, Tracker received additional shipments of parts which were in partial fulfillment of the last purchase order numbered T26429.

In September 2001, at the direction of Janet Jones and/or Terry Schroeder, Tracker rejected and returned to Marco all parts shipped in July and September, without explanation or notice. Tracker re-

fused to talk to and negotiate with Minor, or give him an explanation. Even after Minor hired counsel, Tracker refused to provide an explanation or to meet to resolve the situation. These parts were returned without all the packing lists and invoices, the chain of custody was broken, and they had to be re-inventoried, which Far East paid to have done.

On September 14, 2001, Marco Group refused to accept some of the returned parts and shipped them back to Tracker. Tracker has kept those parts in a concrete-floored storage facility which is protected from the external elements. Tracker has not used any of the parts, and they have been placed in quarantine.

During November 2001 through January 2002, Marco made arrangements to deliver the parts it was holding for Far East to R & R Tool, located in Villa Ridge, Missouri. Those parts have since remained at R & R Tool and are stored in a dirt-floored Quonset hut.

The fasteners at issue in this litigation were standard fasteners used by many companies and individuals around the world. These same types of fasteners can be found at any Wal–Mart and Ace Hardware.

### (2) Procedural Background

Far East filed a two-count petition against Tracker in the Circuit Court of Greene County, Missouri, seeking breach of contract damages under count one for Tracker's failure to pay the purchase price for the parts listed in purchase orders numbered T26411, T26428, and T26429, and under count two for Tracker's failure to pay the $6,750 balance due for Far East's services in furnishing "engineering expertise for the purpose of providing specifications and drawings for the goods." Tracker answered Far East's petition denying any liability under either contract and counterclaimed, contending in count one that Far East violated the Missouri Trade Secrets Act and, in count two, that Far East conspired with Detwiler to violate the Missouri Trade Secrets Act. Tracker also filed a third-party petition against Detwiler, claiming in count one that Detwiler violated the Missouri Trade Secrets Act, in count two that Detwiler conspired with Far East to violate the Missouri Trade Secrets Act, and in count three that Detwiler owed Tracker damages for breach of the Associate Agreement with Tracker for transmitting confidential information to Far East.

Following a three-day bench trial, judgment was entered in favor of Far East and against Tracker for the $6,750 balance due for "engineering services" and for the purchase price of the parts delivered to and accepted by Tracker on July 30, 2001, under purchase orders T26411 and T26428 ("the July parts"). The trial court denied Far East any other recovery for the purchase price of any other parts under the three purchase orders based upon the trial court's findings that: (1) Far East's actions in proceeding to manufacture the parts in the first instance were in violation of the PPAP; (2) the shipment of any parts not otherwise accepted by Tracker was in violation of the vendor warehousing terms of the purchase orders; and (3) Tracker never executed purchase order number T26429, and its enforcement would therefore violate the statute of frauds. The trial court also entered judgment in favor of Far East and against Tracker on both counts of Tracker's counterclaim and in favor of Detwiler and against Tracker on all three counts of Tracker's third-party petition.

Both Far East and Tracker timely appealed the judgment, and both appeals were consolidated for disposition.

### (3) Standard of Review

In this court-tried case, our review is controlled by Rule 84.13(d)[2] and the precepts of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Schubert v. Trailmobile Trailer, L.L.C.*, 111 S.W.3d 897, 899 (Mo.App.2003). "The judgment will be affirmed unless there is no substantial evidence to support it, or unless it is against the weight of the evidence, or unless it erroneously declares or applies the law." *Pelligreen v. Wood*, 111 S.W.3d 446, 450 (Mo.App.2003).

"Under Rule 84.13(d), we defer to the trial court's opportunity to judge the credibility of witnesses." *Smith v. AF & L Ins. Co.*, 147 S.W.3d 767, 773 (Mo.App.2004). "Although we generally defer to the trial court's findings of fact, we review conclusions of law without deference to the trial court." *Id.* "We independently evaluate whether the trial court properly declared or applied the law to the facts presented." *Reinbott v. Tidwell*, 191 S.W.3d 102, 107 (Mo.App.2006) (quoting *Ridgway v. TTnT Dev. Corp.*, 126 S.W.3d 807, 813 (Mo.App. 2004)).

### (4) Far East's Appeal–No. 27847

Far East brings six points of alleged trial court error challenging the judgment in three areas. The first area—points one through four—challenges the trial court's findings and conclusions that purchase order T26429 was not an enforceable contract between Far East and Tracker. The second area—point five—challenges the trial court's denial of recovery to Far East for the purchase price of those parts under purchase orders T26411 and T26428, which Far East did not attempt to ship to Tracker because Tracker had previously re-turned all attempted shipments of parts. The third area—point six—challenges the amount of the contractual damages awarded by the trial court to Far East for the July parts. We will address the three areas in the order presented.

### (a) No Recovery for Purchase Order T26429 Because of Breach of its Warehousing and Shipping Terms

The trial court's denial of any recovery to Far East under purchase order T26429 was premised upon three grounds: (1) the purchase order was not executed by Tracker, and enforcement of the unexecuted purchase order would violate the Statute of Frauds as codified in section 400.2–201(1); (2) Far East breached the PPAP, compliance with which was a precondition to enforcement of the purchase order; and (3) Far East breached the warehousing and shipping requirements of the purchase order, thereby precluding its enforcement.[3] In other words, the trial court found that purchase order T26429 was not a valid contract, but even if it was a valid contract Far East breached the PPAP, warehousing and shipping requirements and therefore could not enforce it.

Far East's points one and four directly attack the first ground—the trial court's determination that purchase order T26429 was not a valid contract because it was not executed by Tracker. Point one asserts that Detwiler had either actual authority or apparent authority to execute it and thereby bind Tracker. Point four asserts that Far East's partial performance by the manufacture and shipment of the parts under purchase order T26429, which were specifically manufactured for Tracker and were parts not suitable for sale to others

**2.** All references to rules are to the Missouri Rules of Civil Procedure (2007), unless otherwise indicated.

**3.** All references to statutes are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

in the ordinary course of Far East's business, removed the purchase order from the requirements of the Statute of Frauds (section 400.2–201(1)) by the application of section 400.2–201(3)(a). Point two assumes a valid contract existed as argued in points one and four, and attacks the trial court's third ground for denying Far East any recovery under purchase order T26429—its breach of the warehousing and shipping terms of the purchase order. Also based upon the same assumption, Far East's point three, while failing to address any of the trial court's three stated reasons for denying it any recovery under purchase order T26429, asserts that Tracker had no legitimate justification to reject the shipped parts.

In order for Far East to succeed in this area of its appeal, it must succeed not only on its claim that purchase order T26429 is a valid contract, but also on its claim that it did not breach the warehousing and shipping requirements of that contract. For ease of analysis, we will address Far East's four points relating to purchase order T26429 out of order and will first address point two regarding the warehousing and shipping requirements. In this point, Far East assumes the existence of a valid contract, and for the purpose of discussing this point we will, without deciding, do likewise. Far East argues that the trial court erred in not finding Tracker liable to pay for the parts under purchase order T26429 as required by section 400.2–301 for two reasons: first, purchase order T26429 does not require Far East to warehouse the parts; and, second, even if it did, Tracker authorized shipment from the warehouse to Tracker. Both of these assertions are directly contradicted by findings of fact made by the trial court.

The trial court specifically found:

While the purchase order [referring to T26429] does not contain shipping instructions, Detwiler and Minor testified that [Far East] would warehouse the parts until Tracker released them on an as needed basis. That agreement was never modified orally or in writing, and no one at Tracker ever communicated to [Far East] that the parts reflected on this purchase order should be released.

■ Far East does not challenge these facts as being not supported by substantial evidence or as being against the weight of the evidence. As best we can discern from its brief, Far East first contends that the trial court misapplied the law in looking outside of the four corners of the purchase order to impose a warehousing requirement upon it. Our discernment is based upon Far East's statements that "[t]he purchase order did not require warehousing[,]" and "[section] 400.2–202 provides written final terms may not be contradicted by evidence of a *prior agreement* or of a *contemporaneous oral agreement.*"

■ Section 400.2–202,[4] the Uniform Commercial Code's version of the Parole Evidence Rule, however, does not apply where a written contract is incomplete and

---

4. Section 400.2–202 provides:
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (section 400.1–205) or by course of performance (section 400.2–208); and
(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

a part of the contract which addresses the incomplete term is not otherwise reduced to a writing. *Kirkwood Med. Supply Co. v. Ann Patterson Enter., Inc.*, 511 S.W.2d 433, 435 (Mo.App.1974). This is so for two reasons: first, if the contract is incomplete as to a particular term, then any parole evidence to complete that term of the agreement is by definition not contradictory of the writing; and, second, section 400.2–202(b) specifically allows "evidence of consistent additional terms."

The trial court properly applied section 400.2–202. Purchase order T26429 was incomplete in that it did not contain any terms related to shipping. The testimony of Minor and Detwiler completed the shipping terms by supplying substantial evidence that the parties' agreement included that Far East would warehouse the parts until Tracker released them for shipping. Thus, the trial court did not err in finding that Far East was required to warehouse the parts under purchase order T26429.

█ The second part of Far East's point two is that, even if it was required to warehouse the parts until Tracker authorized release, Tracker authorized such release as evidenced by the e-mails between Giebel and Detwiler admitted into evidence as exhibits 6 and 6A. This argument is contrary to the specific finding of the trial court that "no one at Tracker ever communicated to [Far East] that the parts reflected on this purchase order should be released."

Far East does not challenge this finding as being unsupported by substantial evidence or as being against the weight of the evidence. As with all contested facts, the trial court was faced with conflicting testimony regarding these e-mails. Far East's evidence would support a finding that these e-mails were Tracker's authorization to ship all but one of the parts listed on purchase order T26429. However, Detwil-

er testified that these e-mails were part of the PPAP and did not concern or involve the release of any parts for shipment. Far East challenges the trial court's finding by merely arguing that Detwiler's testimony "was shown to lack credibility." However, the resolution of conflicting testimony is uniquely the function of the trial court, and we, under our standard of review, defer to the trial court's determination of witness credibility. *Smith,* 147 S.W.3d at 773. Far East's second point is denied.

Far East's point three likewise assumes that a valid contract exists under purchase order T26429 and claims that Tracker breached that contract when it rejected, without justification, Far East's tender of the T26429 parts in September 2001. For the purpose of discussing and deciding this point we will, without deciding, assume the existence of a valid contract.

█ We agree with Far East's assertion that rejection must not only be timely, but also must be justified for good cause. *R.R. Waites Co. Inc. v. E.H. Thrift Air Conditioning Inc.*, 510 S.W.2d 759, 761–62 (Mo.App.1974); *Stephens Inds., Inc. v. American Exp. Co.*, 471 S.W.2d 501, 504–06 (Mo.App.1971). However, the linchpin of Far East's argument is once again the e-mails mentioned in point two—exhibits 6 and 6A. Far East asserts that Tracker authorized shipment, as evidenced by the e-mails, and therefore had no justification to reject the September tender of the parts. As we discussed and determined under point two, Far East's reliance upon these e-mails is misplaced, because the trial court did not believe that they in fact authorized the release of the parts for shipment. Far East's breach of the warehousing and shipping requirements, as found by the trial court, justified Tracker's rejection of the September tender of the parts under purchase order T26429. Point three is denied.

We need not address Far East's remaining points concerning purchase order T26429—points one and four—which address the validity of the contract in the first instance. Far East's breach of the warehousing and shipping provisions of the assumed agreement, as addressed in points two and three, is sufficient to uphold the trial court's denial of any recovery under purchase order T26429, even if it erred, which we do not determine, in its finding that no valid contract existed. Points one and four are denied as being moot.

### (b) No Recovery for Purchase Price for Non–Shipped Parts

The second area addressed by Far East in its appeal—point five—deals with the trial court's denial of recovery to Far East for the purchase price of those parts under purchase orders T26411 and T26428, which Far East did not ship or even attempt to ship to Tracker after Tracker had previously returned all other shipments of parts. Far East claims that the provisions of section 400.2–703(a) relieved it of the obligation to tender these parts in order to recover the purchase price.[5] This claim implicitly assumes that the trial court denied recovery for these parts based upon Far East's failure to tender the parts to Tracker. The trial court, however, never reached this issue, because it denied recovery for these parts "based upon [Far East's] breaches of the PPAP" and the "warehousing and delivery terms."

Far East does not mention or otherwise address under this point why or how its breaches of the PPAP and of the explicit warehousing and shipping terms under purchase orders T26411 and T26428, by the shipment of the July parts without Tracker's authorization, do not preclude its recovery of the purchase price for these parts. The trial court specifically found that compliance with the PPAP was a condition precedent to the production of these parts, that Tracker never approved the drawings for these parts as required by the PPAP, that Tracker never approved the first-piece inspections as required by the PPAP, and that Far East as a result proceeded to produce these parts "at their peril." The trial court specifically found that Far East "breached the express terms of purchase orders T26411 and T264428, which provide for vendor warehousing until release by Tracker."

Far East's breach of the PPAP and the warehousing and shipping terms of the purchase orders gave Tracker the option to reject or accept the shipped parts. Sections 400.2–601 and 400.2–612. While Tracker contended that its return of the shipped parts in September 2001 operated as its rejection pursuant to section 400.2–602, the trial court found that Tracker accepted delivery of the shipped parts in accordance with section 400.2–606. The attempted rejection, in order to be effective, required justification and must have been

---

**5.** Section 400.2–703 provides:

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 400.2–612), then also with respect to the whole undelivered balance, the aggrieved seller may

(a) withhold delivery of such goods;

(b) stop delivery by any bailee as hereafter provided (section 400.2–705);

(c) proceed under section 400.2–704 respecting goods still unidentified to the contract;

(d) resell and recover damages as hereafter provided (§ section 400.2–706);

(e) recover damages for nonacceptance (section 400.2–708) or in a proper case the price (section 400.2–709);

(f) cancel.

timely made by Tracker. Sections 400.2–601, 400.2–602, and 400.2–612. Far East's breaches provided the justification for Tracker to reject the shipped parts. Sections 400.2–601 and 400.2–612. The trial court, however, found that Tracker did not act timely and, its attempted rejection was therefore ineffective and wrongful. *See* discussion of Tracker's eighth point, *infra.*

Apparently Far East is arguing that, even though it wrongfully produced the parts under purchase orders T26411 and T26428 and then wrongfully shipped some of those parts to Tracker, the fact that Tracker wrongfully attempted to reject the shipped parts makes Tracker liable for the purchase price of the balance of the wrongfully produced parts not shipped, because under the provisions of section 400.2–703, Tracker's wrongful rejection of the shipped parts relieved Far East of its obligation to deliver the balance of the parts wrongfully produced in the first instance. We disagree for two reasons.

First, Uniform Commercial Code Comment 2 to section 400.2–703 provides:

> 2. The buyer's breach which occasions the use of the remedies under this section may involve only one lot or delivery of goods, or may involve all of the goods which are the subject matter of the particular contract. The right of the seller to pursue a remedy as to all the goods when the breach is as to only one or more lots is covered by *the section on breach in installment contracts.* The present section deals only with the remedies available after the *goods involved in the breach* have been determined by *that section.* (Emphasis added).

Far East fails to cite us to "the section on breach in installment contracts" and, likewise, fails to proffer any argument why that section would in any way apply Tracker's wrongful rejection of the shipped parts to make it liable for the price of the parts not shipped. We gratuitously observe that section 400.2–612 is the section applicable to an alleged breach of an installment contract, and the majority view is that under this section a buyer's acceptance of a prior defective installment does not, in and of itself, waive the buyer's right to insist that future installments must comply with the contract. 4 LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE, § 2–612:44 (2006); *accord* section 400.2–607(2) ("acceptance does not of itself impair any other remedy provided by this article for nonconformity"), and Uniform Commercial Code Comment 3 to section 400.2–607 ("All other remedies of the buyer remain unimpaired under subsection (2). This is intended to include the buyer's full rights with respect to future installments despite his acceptance of any earlier non-conforming installment."). Far East's failure to demonstrate how section 400.2–612 applies Tracker's breach—the attempted rejection of the shipped parts—to the non-shipped parts to make them "goods involved in the breach" precludes the application of section 400.2–703 in the first instance. Uniform Commercial Code Comment 2 to section 400.2–703.

Second, even if section 400.2–703 did apply to the non-shipped parts, it "is an index section which gathers together in one convenient place all of the various remedies open to a seller for any breach by the buyer." Uniform Commercial Code Comment 1 to section 400.2–703. One such remedy is for the seller to "withhold delivery of such goods." Section 400.2–703(a). Another such remedy is for the seller to recover "in a proper case the price (section 400.2–709)." Section 400.2–703(e). Because these remedies are cumulative, any action by Far East to recover for the price of the non-shipped parts is governed by the provisions of section 400.2–709, notwithstanding that withholding delivery of

such parts is also an available remedy under section 400.2–703(a).

Section 400.2–709(1) only authorizes the seller's recovery of the price for (1) "goods accepted[,]" (2) "conforming goods lost or damaged[,]" or (3) "goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." In the case at bar, the non-shipped parts under purchase orders T26411 and T26428 were not accepted, and they were not conforming goods lost or damaged. Assuming that they were goods identified to the contract, which we do not necessarily determine, the evidence in the light most favorable to the trial court's judgment does not support that Far East was unable after reasonable effort to resell them at a reasonable price or that the circumstances reasonably indicated that such effort would have been unavailing. Indeed, the trial court made a specific finding that "[t]he fasteners at issue in this litigation were standard fasteners used by many companies and individuals around the world." Minor, Far East's principal, admitted that these same types of fasteners can be found at Wal–Mart and Ace Hardware. Therefore, even if section 400.2–703 authorizes Far East to withhold delivery of the non-shipped parts under these purchases orders, section 400.2–709 does not grant Far East the right to recover the purchase price for these parts. Far East's fifth point is denied.

### (c) Amount of Damages is Supported by Substantial Evidence

The third area challenged by Far East—point six—concerns the amount of the contractual damages awarded by the trial court to Far East for the parts delivered to and accepted by Tracker on July 30, 2001, the July parts. On February 1, 2006, the trial court initially entered judgment for Far East for these parts, in the amount of $164,889.01. Thereafter, pursuant to a timely filed after-trial motion by Tracker and within the time that it retained jurisdiction over the judgment, the trial court revisited the amount of this award, and on April 11, 2006, it amended the judgment to provide, among other things: "2. Per the *undisputed* evidence presented by Tracker, the court hereby amends it's [sic] judgment of 2/1/06 in the sole respect of reducing the total of parts figure from $164,889.01 to $159,846.35 and in reducing the principal amount of the judgment by like amount." (Emphasis added). This amendment was challenged by Far East in a timely filed after-trial motion, in response to which the trial court, on June 15, 2006, entered the following: "The court amends the amended judgment in the sole respect of striking in paragraph two the word 'undisputed' and replacing it with the word 'persuasive.'"

Far East argues that the trial court erred in reducing the amount of damages as set in the initial judgment, in that such reduction was based upon Tracker's representation that the *undisputed* evidence supported that reduction when in fact Far East's invoices, as evidenced by Exhibit 125, do not support that reduction. However, the trial court's amendment to the judgment on June 15, 2006 quickly dispels the notion that the trial court erroneously relied upon such a representation by Tracker. That amendment demonstrates that the trial court simply found Tracker's evidence on the issue of the amount of damages to be persuasive, not undisputed.

■ Far East presented evidence that the contracted price for the July parts was $164,889.01. This evidence was based upon its invoices as evidenced by its exhibit 125. Tracker presented evidence that the contracted price for the delivered and

accepted parts was $159,846.35.[6] This evidence was based upon its purchase orders as evidenced by its exhibits B–1 and B–2, and Minor's testimony as to which parts on those purchase orders were or were not included in the shipment. Obviously, this evidence was conflicting. While there was no dispute about the price per unit of each part, the evidence conflicted as to the number of units of each part that was actually delivered and accepted by Tracker on July 30, 2001, and whether Tracker was obligated to pay for any parts shipped in excess of the number of parts ordered on the purchase orders. The resolution of this conflicting evidence is a credibility determination to be made by the trial court. *Smith*, 147 S.W.3d at 773. The trial court was free to believe that no more than the amount of units shown on the purchase orders were in fact delivered and accepted by Tracker or that Tracker did not agree to pay for any overages. Either way, the trial court's judgment as to the amount of damages sustained by Far East for these parts is supported by substantial evidence and is not erroneous as argued. Far East's sixth point is denied.

### (5) Tracker's Appeal–No. 27829

Tracker challenges the trial court's judgment, alleging eight points of error. Conveniently, Tracker has numbered its points (7–14) consecutive to Far East's points (1–6), which we have already addressed. For consistency and clarity, we will refer to Tracker's points as so numbered. Tracker's eight points challenge four areas of the judgment: points eight, nine, ten, and eleven contest the award of damages in favor of Far East for the contract price of the July parts; point thirteen challenges the trial court's award of pre-judgment interest on such award; points seven and twelve challenge the trial court's failure to apply section 327.461 as a bar to Far East's recovery; and point fourteen challenges the judgment in favor of Detwiler on Tracker's claim that he breached the Associate Agreement. While we will address each of these areas in the preceding order, for ease of analysis, we will take Tracker's points out of order.

### (a) Tracker Accepted the July Parts

Tracker's eighth point asserts that the trial court erred in finding that Tracker did not timely, seasonably, and reasonably reject the July parts. Tracker contends that its actions in rejecting the July parts just thirty-eight days after their delivery and providing written notice of that rejection to Marco was a timely, seasonal, and reasonable rejection of the parts, as a matter of law. We note that Tracker does not challenge the trial court's findings as not being supported by substantial evidence or as being against the weight of the evidence, but simply as being in error as a matter of law.[7]

Goods are accepted when a buyer has a reasonable opportunity to inspect them and then fails to effectively reject them.

---

6. Tracker asserts that the parties "stipulated" to this amount. We have reviewed the transcript and disagree. While Far East stipulated that it was not seeking any recovery for parts not actually manufactured and then actually delivered on this date, it did not stipulate that no overages were delivered on that date or that Tracker was not liable for the payment of those overages.

7. Tracker's brief did not state a standard of review for each separate point, as required by Rule 84.04(e), which provides, in part: "The argument shall also include a concise statement of the applicable standard of review for each claim of error." Rather, Tracker made one statement of the standard of review applicable to all points, concluding: "Because the issues in this appeal involve conclusions of law, *de novo* review is appropriate."

Section 400.2–606(1)(b).[8] The trial court made a specific finding that Tracker had a reasonable opportunity to inspect the July parts, and Tracker does not challenge that finding. Thus, the only issue for us to consider, as framed by Tracker, is whether its actions thirty-eight days after the delivery of the parts was an effective rejection, as required by section 400.2–606(1)(b), as a matter of law. If not, then Tracker accepted the July parts.

Rejection of goods (1) must occur within a reasonable time after delivery or tender, and (2) is not effective until the buyer gives seasonable notice to the seller. Section 400.2–602(1). An effective rejection requires compliance with both requirements. *Id.* Conversely, failure to comply with one of the requirements would, by definition, negate the existence of an effective rejection. Thus, if Tracker's claim—that its actions thirty-eight days after the delivery and tender of the July parts is within a reasonable time as a matter of law—is not correct, then we do not need to address whether or not Tracker gave seasonable notice of those actions.

In support of its timeliness claim, Tracker cites *Bell v. May Department Stores Co.*, 6 S.W.3d 871 (Mo. banc 1999), for the proposition that because our Supreme Court in *Bell* held that three months after purchase is a reasonable time within which to reject goods, then Tracker's actions just thirty-eight days after delivery would also be within a reasonable period of time as a matter of law. The flaw in this proposition

is that its premise—three months was a reasonable period of time within which to reject goods as a matter of law—is not supported by the holding in *Bell.* In reversing a grant of summary judgment against Mr. Bell, our Supreme Court merely held that given the seller's attempts to cure within the three months after purchase, a genuine issue of material fact existed as to whether Mr. Bell timely rejected the goods. *Id.* at 876. In other words, based upon a totality of the circumstances, a finder of fact could find, but was not required to find, that three months was a reasonable time within which to reject goods. According to the Supreme Court, the *Bell* trial court erred as a matter of law only in denying Mr. Bell the opportunity to have the reasonableness of the time-period issue resolved by the finder of fact. *Id.*

Here, unlike in *Bell,* the question of whether Tracker rejected the parts within a reasonable time after delivery was submitted to the finder of fact, and the trial court determined the issue adversely to Tracker. While there are facts in the record that, when viewed in the light most favorable to Tracker, would support that it acted within a reasonable time period, there is also, as admirably pointed out by Tracker in its own brief, substantial evidence supporting the trial court's finding that it did not act within a reasonable time. Where fair-minded persons could disagree, the resolution of the fact issue of whether an action occurs within a reasonable period

---

8. Section 400.2–606 provides:
(1) Acceptance of goods occurs when the buyer
(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
(b) fails to make an effective rejection (subsection (1) of section 400.2–602), but such

acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
(2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

of time is reserved for the finder of fact. *Id.* Where that decision is supported by substantial evidence and is not against the weight of the evidence, neither of which Tracker argues in this appeal, we can not say, based upon *Bell*, that thirty-eight days is a reasonable period of time as a matter of law.[9] Tracker's eighth point is denied.

■ Tracker's ninth point challenges the trial court's award of damages to Far East for the purchase price of the July parts on the basis that Far East's breaches of the contract -failing to comply with the PPAP and the warehousing and delivery terms of the contract—precluded its recovery of the purchase price under section 400.2–709. Tracker cites *S.G. Adams Printing & Stationery Co. v. Central Hardware Co.*, 572 S.W.2d 625 (Mo.App. 1978), for the proposition that: "A party to a contract cannot claim its benefits where he is the first to violate it." *Id.* at 629. Tracker misconstrues the holding in Adams and misapplies it to the applicability of section 400.2–709 in the instant case.[10]

Immediately following its recital of the "first to breach" rule, the court in *Adams* cites to section 400.2–601 as support for that rule. This section provides, in part, that: "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." Section 400.2–601. This section is sometimes referred as the "perfect tender rule," which "purports to require a seller to perform perfectly, as it provides that a buyer may reject the goods if they fail in any respect to conform to the contract."[11] *Paramount Sales Co., Inc. v. Stark*, 690 S.W.2d 500, 504 (Mo.App.1985). The *Adams* court found that the seller's attempted assembly and installation of some of the goods without all of the necessary parts did not conform to the contract and that the buyer's actions the next day in disassembling the existing goods, storing them in its warehouse, and sending the seller notice to pick them up, absolved the buyer from any liability under the contract for the purchase price of the goods. *Adams*, 572 S.W.2d at 629. Even though

9. Tracker also generally cites us to *Bowen v. Foust*, 925 S.W.2d 211 (Mo.App.1996) (revocation of acceptance one year after delivery was reasonable) and *Reed & Prince Manufacturing Co. v. Lear, Inc.*, 78 F.Supp. 394 (D.Mich.1948) (rejection of bolts months after delivery was reasonable). *Bowen* has no applicability to the instant case in that it addresses revocation of acceptance under section 400.2–608 and not rejection under section 400.2–602. *Bowen*, 925 S.W.2d at 214–15. While *Reed* is an example of a particular time period within which the finder of fact found reasonable, given the totality of the circumstances in that particular case, it does not stand for the proposition that any particular time period, such as thirty-eight days in the instant case, is reasonable as a matter of law.

10. Tracker also supports this proposition by citing to *Roeder v. Ferrell–Duncan Clinic, Inc.*, 155 S.W.3d 76, 89–90 (Mo.App.2004). *Roeder*

involved the alleged breach of an employment contract which is not governed by the provisions of Article 2 of the Uniform Commercial Code, as codified in Missouri in sections 400.2–101, et seq. As such, *Roeder* lends no assistance in analyzing the application of the provisions of the UCC to the instant case and no support to Tracker's assertion regarding the inapplicability of section 400.2–709.

11. Section 400.2–612 dealing with installment contracts provides that "[t]he buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured[.]" We need not address the interplay between this provision and the "perfect tender rule" in section 400.2–601, because the application of both, regardless of which applies, give rise to the right of a buyer to reject tendered goods, which did not occur in the case at bar.

not denominated as such, the buyer's actions in *Adams* were a rejection of the goods. *Id.;* section 400.2–602. Other than recognizing the seller's ownership of rejected goods and holding them for a reasonable time for seller to take possession of them, a buyer, such as that in *Adams,* who rightfully rejects goods, has no further obligation for the goods. Section 400.2–602(2). Thus, a buyer who rightfully rejects goods is not subject to liability for the purchase price under the provisions of section 400.2–709. Section 400.2–602(2)(c).

The holding in *Adams* has no applicability to the instant case because, unlike the buyer in *Adams* who rejected the tendered goods, Tracker accepted the July parts as discussed in the preceding point—Tracker's eighth point, *supra.* "The buyer must pay at the contract rate for any goods accepted." Section 400.2–607(1). Section 400.2–709(1) provides, in pertinent part, that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under section 400.2–710, the price ... of goods accepted[.]" Section 400.2–709(1)(a). While a non-conforming tender may justify rejection of the goods and a denial of seller's recovery of the purchase price as in *Adams,* once a buyer accepts the goods, as Tracker did, the buyer becomes liable for the purchase price less buyer's damages for the non-conforming tender, if any, allowed pursuant to section 400.2–714. Sections 400.2–709 and 400.2–714. Tracker's ninth point is denied.

■ We next consider Tracker's point eleven, in which Tracker asserts that the trial court erred in awarding Far East the full purchase price for the July parts, because section 400.2–709 required Far East, once it chose to mitigate its damages, to make a reasonable effort to do so, and it failed to take reasonable mitigation steps. Tracker claims that "despite the fact that Minor had years of experience in sales, he personally made no efforts to sell the parts." Tracker also claims the evidence supports that in January 2005, Minor asked James Martin, his accountant, to make efforts to sell the parts, that the accountant sent out thirty-one letters to tool and die companies he identified from an internet search, that the accountant failed to solicit offers from fastener distributors or suppliers or from potential buyers in the marine industry, and that the accountant "admitted he was not the right person to sell the parts when questioned about his attempt to sell boat cleats to a door manufacturer."

We begin our analysis with sub-section 2 of section 400.2–709, upon which Tracker relies to support its argument and which provides:

> (2) Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he *may* resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold. (Emphasis added).

Tracker demurely acknowledges that under the explicit terms of this sub-section, any decision by Far East to mitigate its damages in the first instance is discretionary. Tracker argues, nevertheless, that once Far East exercised its discretion and decided to consider mitigating its damages, it had to do so in a reasonable manner, and it did not because it failed to actually sell the goods when a market for the goods was readily available. Tracker, however, confuses Far East's actions in considering whether it could mitigate its damages, which is not explicitly addressed in the sub-section, with the action of actu-

ally mitigating its damages, which is within the seller's discretion allowed by this subsection and which Far East exercised its discretion not to do.

Mitigation under section 400.2–709(2) is a two-step process. First, the seller must determine "if resale becomes possible." Second, if resale is possible, the seller must determine whether to exercise its discretion and actually sell the goods to effectuate the mitigation. In the case at bar, Far East took the first step and investigated whether resale of the goods was possible. Far East, however, never took the second step and actually sold any of the goods to mitigate its damages. Thus, Far East, having never exercised its discretion to actually mitigate its damages, did not contravene any provision in section 400.2–709(2). Point eleven is denied.

■■■ Tracker's tenth point challenges the trial court's declaration of law that Tracker's acceptance of the July parts waived any claim Tracker might have that the parts were defective. Tracker pleaded the defectiveness of the parts as an affirmative defense to Far East's claim for the purchase price and presented evidence that the parts were defective. Far East presented evidence that the parts were not defective. However, the trial court never considered whether the July parts were in fact defective because of its legal conclusion that "Tracker's acceptance of that shipment waived any such defects." Tracker claims that this legal conclusion by the trial court erroneously declares the law and that because of such misdeclaration, the trial court failed to consider and rule upon its defectiveness claim. While we agree that Tracker's acceptance of the parts did not in and of itself waive any claim that the parts were defective, Tracker's failure to give Far East timely notice of the alleged non-conformity, as specifically found by the trial court and not challenged by Tracker on this appeal, bars any recovery by Tracker for the alleged defects.

Generally, when a seller tenders goods which a buyer then or later claims are nonconforming, the buyer may either reject or accept them. Section 400.2–601. If the buyer rightfully rejects them because they are in fact nonconforming, the buyer has no further obligation for the goods other than to reasonably store them until the seller can take possession of them. Section 400.2–602(2). If the seller later proves that the goods actually conformed to the contract, then the seller has the right to damages from the buyer for wrongful nonacceptance. Section 400.2–708.

If, however, a buyer accepts the tender of the goods, a different set of rules applies. Section 400.2–607. First, the buyer becomes obligated to pay the contract price for the goods. Section 400.2–607(1). Second, the acceptance thereafter precludes rejection by the buyer. Section 400.2–607(2). Third, in certain specific situations the acceptance of the goods also precludes the later revocation of acceptance by the buyer. *Id. See also* section 400.2–608. Fourth, acceptance does not of itself impair any other remedy provided buyer under the law for nonconformity. Section 400.2–607(2). Fifth, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Section 400.2–607(3)(a). And, sixth, the burden of proving any breach by non-conformity is placed upon the buyer. Section 400.2–607(4).

Tracker seizes upon the fourth rule—acceptance does not of itself impair any other remedy for nonconformity—to support its argument that the trial court misdeclared that Tracker's acceptance of the parts waived and precluded its claim that

the parts were nonconforming. We agree with this proposition and find that the trial court misdeclared the law in that respect.

However, Tracker ignores the fifth rule with its requirement that Tracker give reasonable notice of any breach to Far East and the trial court's specific finding that:

> Even were the court to find that a particular part or parts was non-conforming such as the washer, part of a part. [Tracker] gave no notice of such defect for four years. Under the UCC [Far East] is entitled to timely notice and a chance to cure. The reason behind such rule/ruling is to avoid state claims. Here [Far East] was denied that chance.

Tracker does not challenge this finding as being not supported by substantial evidence, against the weight of the evidence, or as a misdeclaration or misapplication of the law. Without such a challenge, we have no reason not to accept the trial court's finding that Tracker failed to give Far East timely notice of its claim that the parts were defective. Such lack of a timely notice, as required by section 400.2–607(3)(a), bars Tracker from any remedy for the alleged defects in the parts.[12] Therefore, the trial court did not err in failing to consider whether the parts were in fact defective. Tracker's point ten is denied.

### (b) Far East's Claim for the Purchase Price of the July parts is Liquidated

■ Tracker's thirteenth point challenges the trial court's award of prejudgment interest on the damage award for the purchase price of the July parts in favor of Far East. Tracker argues that Far East's claim was not liquidated as required for the application of section 408.020 to support a prejudgment interest award, in that both Far East's "theory of recovery and the amount at issue were uncertain and disputed through the date of judgment." We disagree.

■ Section 408.020 provides, in pertinent part: "Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts[.]" Section 408.020. Interest under this statute is awardable only upon liquidated claims. *Baris v. Layton,* 43 S.W.3d 390, 397 (Mo.App.2001). A liquidated claim must be in an amount that is fixed and determined, readily determined, or ascertainable by computation. *Jerry Bennett Masonry, Inc. v. Crossland Const. Co., Inc.,* 171 S.W.3d 81, 90 (Mo.App.2005). A mere dispute as to liability is insufficient to render a claim unliquidated. *Baris,* 43 S.W.3d at 397. Similarly, the imposition of an unliquidated counterclaim or offset by an opposing party does not convert a liquidated claim into an unliquidated claim. *American Laminates, Inc. v. J.S. Latta Co.,* 980 S.W.2d 12, 25 (Mo.App.1998).

Tracker asserts that a claim is "unliquidated if the amount due in is dispute." In support of this broad statement, Tracker cites *St. John's Bank & Trust Co. v. Intag, Inc.,* 938 S.W.2d 627, 630–31 (Mo.App. 1997), and *H & B Masonry Co. v. Davis,* 32 S.W.3d 120, 125 (Mo.App.2000). These cases do not fully support Tracker's claim, but rather, only support it to the extent that a claim is unliquidated if the amount due is disputed because the measure of damages is uncertain.

---

12. A buyer's remedy for breach in regard to accepted goods as provided in section 400.2–714 is expressly conditioned upon the buyer's notification to the seller of the breach as required by section 400.2–607(3)(a). Section 400.2–714(1).

The court in *St. John's Bank & Trust Co.* held:

> Since this lawsuit began the parties have disputed which measure of damages is applicable. St. John's successfully argued that it was the reasonable value of costs incurred and services rendered to replace the damaged equipment with new components before the next business day. Intag unsuccessfully urged the proper measure was the fair market value of the damaged items immediately before and immediately after the incident. Because the measure of damages was uncertain, § 408.020 RSMo 1994 was not applicable.

*St. John's Bank & Trust Co.*, 938 S.W.2d at 630.

Likewise in *H & B Masonry*, the court observed that the amount of the claim was "the lower of the cost-to-repair or diminution-in-value[.]" *H & B Masonry Co.*, 32 S.W.3d at 124. One party contended for the diminution-in-value amount and the other party contended for the cost-to-repair amount. *Id.* Finding that the cost-to-repair was the lower of the two, the court then denied prejudgment interest on the lower amount as being unliquidated because the parties disputed how the amount of damages was to be calculated, i.e., the proper measure of damages. *Id.* at 124–25.

Here, the parties did not dispute the measure of damages on Far East's claim for the purchase price of the July parts. Thus, *St. John's* and *H & B Masonry* are not applicable. It is undisputed by the parties that the proper measure of damages for the purchase price is the per unit price of each part as stated in the purchase orders. The only dispute in the parties' calculations was whether Tracker was liable under the contract to pay for any parts delivered in excess of the number actually ordered in each purchase order, i.e., the overages. The trial court resolved this issue in Tracker's favor and entered judgment against Tracker based upon the number of units of each type of part actually delivered or the number of units for each part as listed on each purchase order, whichever was less. Tracker's contest of its liability for the overages does not render Far East's claim unliquidated. *Baris*, 43 S.W.3d at 397. Obviously, the amount of the claim is ascertainable by computation and, as such, is liquidated.[13] *Jerry Bennett Masonry, Inc.*, 171 S.W.3d at 90; *Bolivar Insulation Co. v. R. Logsdon Builders, Inc.*, 929 S.W.2d 232, 236 (Mo.App.1996).

Tracker's claim that the parties disputed the measure of damages and the amount of damages because Far East "did not elect between an action for price under section 400.2–709 or for ordinary damages under section 400.2–708 until midway through trial[,]" is without merit. The only claim upon which judgment was entered was the claim for the price which was a liquidated claim. The fact that Far East pursued an alternative unliquidated claim for damages during part of the litigation does not transform the liquidated claim for the price into an unliquidated claim. *See e.g., American Laminates, Inc.*, 980 S.W.2d at 25.

Likewise Tracker's argument that the claim was unliquidated because Far East only recovered for one shipment when it sued for multiple shipments is without merit. "[A]n award of less damages than requested does not preclude an award of prejudgment interest on the ascertained damages." *A.G. Edwards &*

---

13. Indeed, in response to Far East's point six, Tracker argues that the parties stipulated that this amount was $159,846.35, which is the exact amount of the judgment entered by the trial court against Tracker on the judgment. *See* footnote 6.

*Sons, Inc. v. Drew,* 978 S.W.2d 386, 397 (Mo.App.1998) citing *Catron v. Columbia Mut. Ins. Co.,* 723 S.W.2d 5, 6 (Mo. banc 1987). Tracker's point thirteen is denied.

### (c) Contract to Provide Engineering Services is not Enforceable

■ Tracker's seventh point asserts the trial court erred in entering judgment against it on its agreement with Far East to provide engineering services and for the purchase price of the July parts. Tracker contends that the engineering services and the delivery of the July parts arose out of a single contract which obligated Far East to provide engineering services to Tracker and that the application of section 327.461 makes the entire contract unenforceable, because Far East was rendering professional engineering services under the contract as defined by section 327.181. While we agree that Far East rendered professional engineering services under the initial agreement with Tracker, we disagree that such services were rendered under the contract for the July parts.

■ The applicability of section 327.461 as an affirmative defense to the enforcement of the contract is a question of law. *Carson–Mitchell, Inc. v. Macon Beef Packers, Inc.,* 544 S.W.2d 275, 276 (Mo.App.1976). As such, "[w]e independently evaluate whether the trial court properly declared or applied the law to the facts presented." *Reinbott,* 191 S.W.3d at 107 (quoting *Ridgway,* 126 S.W.3d at 813).

The trial court found the following. In October or November of 2000, Tracker agreed to purchase engineering services from Far East at the rate of $50 to $60 per hour. Such services included providing Tracker with drawings of some parts then currently in use by Tracker. "Far East agreed to be responsible for including all necessary information on the drawings, and had the responsibility to research the engineering issues it could not independently resolve." Pursuant to this agreement, "Giebel, with help, gathered parts, took measurements, did analysis and prepared or at least viewed and/or revised approximately 150 separate drawings." These drawings were submitted to Tracker. "Giebel holds an engineering degree but is not a licensed engineer." The trial court granted Far East judgment for $6,750.00 as the balance due for "engineering services provided" and found "that the specific involvement of a credentialed engineer or by Mike Giebel personally was not a prerequisite to such services."

Section 327.461 provides:

Every contract for architectural or engineering or land surveying services entered into by any person who is not an architect or professional engineer or professional land surveyor, as the case may be, and who is not exempt from the provisions of this chapter, shall be unenforceable by the unlicensed or unauthorized person, whether in contract, quantum meruit or other legal theory, regardless of whether a benefit has been conferred.

Tracker contends that Far East contracted to provide engineering services and, because neither Far East nor Giebel are licensed professional engineers, the contract is unenforceable. The record is clear and undisputed that neither Far East nor Giebel are licensed to practice engineering in Missouri, as mandated by sections 327.401 and 327.191, respectively. Thus, the threshold issue for us to resolve is whether Far East provided engineering services pursuant to any contract as proscribed by section 327.461. If so, only then do we need to address the scope of such contract.

For resolution of the threshold issue we turn to section 327.181 to explore the type

of engineering services which require licensure under Chapter 327. This section provides in relevant part:

> Any person practices in Missouri as a professional engineer who renders or offers to render ... any service or creative work, the adequate performance of which requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as ... investigation, evaluation, ... and design of engineering works and systems ... in connection with any ... machines, equipment, ... or projects[.]

Section 327.181. If the engineering services provided by Far East meet this definition, then its failure to be licensed as required by Chapter 327 mandates the application of section 327.461 to make any contract for such services unenforceable. *Haith & Co., Inc. v. Ellers, Oakley, Chester & Rike, Inc.*, 778 S.W.2d 417, 420–21 (Mo.App.1989).

 We initially observe that the parts in question fall within the categories of "machines" (e.g., screws, nuts, bolts, and other fasteners) and "equipment" (e.g., boat cleats and other component parts).

We next observe that in exchange for the payment of $50–$60 per hour expended, Far East agreed to provide Tracker the following "services and creative work." First, Far East agreed to gather samples of existing parts used by Tracker. Second, it agreed to analyze and evaluate each part by taking its measurements, identifying the composition, grade, and quality of the materials of which it was made, and identifying the composition, grade, and quality of any coatings on the part. Third, Tracker agreed to make dimensional drawings of each part which would additionally contain sufficient specifications such that the part could be manufactured to the same specifications as that of the sample originally provided by Tracker to Far East.

This leads us then to the question under section 327.181 of whether the "adequate performance" of the services and creative work provided by Far East "requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as ... investigation, evaluation, ... and design of engineering works[.]" Far East in its brief contends that this "agreement for drawings did not specifically require or call for a licensed professional engineer." In support of this proposition, Far East cites us to *Anglin Eng'g Co. v. J.E. Barry Co. Inc.*, 912 S.W.2d 633 (Mo. App.1995), claiming that the court in *Anglin Eng'g Co.* upheld "that providing isometric [14] drawings for pipe replacements did not constitute the provision of professional engineering services and thus fall under the provision of § 327.461 preventing enforcement of the contract." We have no quarrel with this characterization of the holding in *Anglin Eng'g Co.* Indeed, in the instant case, there was testimony that the drafting involved in the drawings in question did not require the services of a professional engineer. However, because Far East agreed to provide many services in addition to drafting, *Anglin Eng'g Co.* is distinguishable from the case at bar.

Far East agreed to "investigate" and "evaluate" the sample parts provided by Tracker. Minor described this process as:

> We would ask for 10, 15, 20 parts per part, because we didn't have any prints.

---

**14.** Isometric drawings are "graphic representations of three-dimensional objects." ENCY-CLOPAEDIA BRITANNICA. http://www.britannica.com/eb/article–9042956.

And so we were going to have to take these as a representative sample, and from measuring them, viewing them, checking thread pitches, minor diameters, major—all the technical things, we were going to have to discover what was this screw. And by that I mean specifically. There's all kinds of screws. There's all kinds—what materials they're made out of. You cannot look at a screw and always tell whether it's made out of stainless or cold rolled or aluminum or what. You can't look at it and tell. You may sometimes, but as a general rule, no. They—They gave us nothing, other than part number and quantity.

Because "[y]ou cannot look at it and tell," these actions required specialized knowledge of the mathematical, physical, and engineering sciences to analyze the composition of the materials from which the component pieces of a particular part were made, the composition of any coatings on the part or any of its component pieces, and how the component pieces of each part interrelated and interoperated with each other in order for the part to operate correctly and as intended. In some cases, this required laboratory metallurgical testing and analysis of the physical characteristics of the materials in order to ascertain the composition of the materials of which the part was made or the coatings applied.

Far East also exercised knowledge of the mathematical, physical, and engineering sciences by translating the information it acquired in its investigation and evaluation of the sample parts, including synthesizing the metallurgical laboratory test results, to design specifications on the drawings for the parts such that a potential manufacturer would have sufficient information with which to manufacture the part to essentially the same specifications as the sample part.

The specialized knowledge of the mathematical, physical, and engineering sciences exercised by Far East both in its investigation and evaluation of the sample parts and in designing and placing appropriate specifications for the parts on the drawings, coupled with Far East's implicit representation that the drawings with those design specifications would be sufficient for a manufacturer to produce parts like the sample parts, without a doubt required "engineering education, training, and experience." From the above analysis, we conclude that Far East's services in developing and designing specifications from the sample parts and placing those specifications on the drawings meet the definition of professional engineering set forth in section 327.181, and therefore any contract providing for such engineering services is unenforceable by the express provisions of section 327.461.

Far East's contention that section 327.461 does not apply because the parties did not contemplate the involvement of a professional engineer provides no relief from the application of section 327.461. No provision in either section 327.461 or section 327.181 negates the registration requirement based upon the parties' agreement or intention not to use a professional engineer. *See In re Branson Mall, Inc.*, 120 B.R. 1006, 1014 (Bkrtcy. W.D.Mo.1990). "The registration statute must be strictly construed." *Hospital Dev. Corp. v. Park Lane Land Co.*, 813 S.W.2d 904, 908 (Mo.App.1991) (citing *Haith*, 778 S.W.2d at 422). The statutory scheme focuses strictly upon the nature of the services provided and not upon the intention of any actor. Far East was solely responsible for complying with the registration requirement for its actions even if the parties did not contemplate the in-

volvement of a professional engineer. *Branson Mall,* 120 B.R. at 1014.

Finally, Far East contends that section 327.191(3) [15] "exempts from the requirements of [section] 327.181 persons regularly employed (here Giebel) in manufacturing operations (here Far East) and who's [sic] engineering services (the drawings) relate, to the manufacture, sale or installation of the products (the parts here) of such persons (Far East) for sale (here to Tracker)." This contention fails for two reasons. First, there is no evidence in the record that Far East engaged in manufacturing operations. It simply took orders and then contracted out the manufacture of the goods to an entity that was engaged in manufacturing operations. Second, there is no evidence in the record to support that the services were provided incidental to the sale of manufactured goods as contemplated by this statute. Indeed, all of the evidence was that Tracker was required to pay for these services even if it never ordered a part from Far East.

Having decided the threshold issue in Tracker's favor, we now turn to the second issue of whether the engineering services and the purchase of the July parts were part of the same contract or involved separate contracts. The evidence was undisputed that Tracker agreed to pay for the engineering services regardless of whether it ever ordered any parts from Far East or not. This strongly indicates that the engineering services agreement was a separate and distinct contract from any agreements arising out of the purchase orders for the July parts. Nevertheless, Tracker argues that the PPAP also required Far East to provide the drawings to Tracker prior to the manufacture of the parts as an indication that the provision of the drawings by Far East was not severable from the contract for the July parts. Tracker ignores the differing functions for the drawings under each agreement.

The engineering agreement, not the PPAP, required Far East to provide the drawings to Tracker with specifications as shown thereon equivalent to the specifications of the sample parts provided by Tracker, i.e., engineering services. Once the drawings were delivered under the engineering agreement, Tracker had the right to use or not use the drawings as it saw fit.

Thereafter, Tracker chose to issue purchase orders T26411 and T26428, which contained no order or authorization for engineering services, but rather, contained only authorization for the payment of the price of the parts. Compliance with the PPAP was a condition precedent to such payment under these purchase orders. While the PPAP required Far East to provide drawings for each part ordered, the function of such drawings was to identify the contract specifications of the ordered parts, which is evidenced by the fact that the PPAP also required Tracker to approve the drawings. The provision for

---

**15.** Section 327.191 provides, in pertinent part:

No person shall practice as a professional engineer in Missouri, as defined in section 327.181 unless and until there is issued to such person a professional license or a certificate of authority certifying that such person has been duly licensed as a professional engineer or authorized to practice engineering in Missouri, and unless such license or certificate has been renewed as provided in section

327.261; provided that section 327.181 shall not be construed to prevent the practice of engineering by the following persons:

\* \* \*

(3) Any person engaged in engineering who is a full-time, regular employee of a person engaged in manufacturing operations and which engineering so performed by such person relates to the manufacture, sale or installation of the products of such person[.]

drawings under the PPAP was not for the purpose of requiring Far East to provide any engineering services to Tracker because there was no requirement in the purchase orders that the ordered parts have the same specifications as the sample parts provided by Tracker, only that the parts meet the specifications shown on the drawings. The engineering services provided by Far East in contravention of section 327.181, as described above, were completed upon the delivery of the drawings to Tracker with no obligation for Tracker to order any parts and with no requirement that Tracker approve them. The PPAP never came into existence unless and until Tracker issued a purchase order. Therefore, Tracker's argument must fail because section 327.461 only makes contracts for the provision of engineering services unenforceable. Thus, it is not applicable to the purchase orders which led to the delivery of the July parts.

*Kansas City Cmty. Ctr. v. Heritage Indus., Inc.*, 972 F.2d 185 (8th Cir.1992), as cited by Tracker is easily distinguishable. There, Kansas City Community Center entered into a contract for the planning, design, and construction of a building for the total price of $477,300. The contract required Heritage to provide construction plans for the building; yet, Heritage was not licensed to provide architectural or engineering services in Missouri. The trial court held the contract unenforceable under section 327.461 and refused to sever the engineering services from the entire contract, as argued by Heritage, and the Eight Circuit affirmed. Here, the engineering services were paid for in a manner and by agreement separate and apart from any contract to purchase the July parts.

Tracker's seventh point is granted as to the judgment against Tracker and in favor of Far East for $6,750.00, plus prejudgment interest on that amount, on the engineering services agreement, which is reversed, and denied as to the judgment for the price of the July parts. As Tracker's point twelve relates only to the engineering services agreement judgment, its consideration by us is now moot, given our partial grant of Tracker's point seven on that judgment.

### (d) Tracker's Point Fourteen is Dismissed

 Tracker's point fourteen claims that the trial court erred in entering judgment in favor of Detwiler on Tracker's claim against him for breach of contract arising out of Detwiler's Associate Agreement because the judgment is inconsistent with the trial court's finding that "Detwiler gave Giebel a list of ... current prices for each Tracker part [Far East] quoted." Detwiler filed a separate motion to dismiss this point for Tracker's failure to cite any relevant legal authority in support of its point as required by Rule 84.04(d)(5), which we ordered to be taken with the case.[16] Detwiler also raised this issue in his brief in response to Tracker's initial brief.

In its suggestions in opposition to Detwiler's motion to dismiss, Tracker responded: "Tracker intentionally did not cite authorities because it is not arguing the court's judgment is inconsistent with Missouri Law; rather, Tracker is arguing *the court's ruling was incorrect as a matter of law* and against the weight of the evidence [17] because the trial court could not

---

**16.** Rule 84.04(d)(5) provides: "Immediately following each 'Point Relied On,' the appellant, ... shall include a list of cases, not to exceed four, and the constitutional, statutory, and regulatory provisions or other authority upon which that party principally relies."

**17.** Nothing in Tracker's brief, filed after its suggestions in opposition to the motion to

have made the fact finding it did consistent with its judgment." (Emphasis added). Likewise in its reply brief, Tracker stated: "Tracker did not include case cites because Tracker's argument is that the trial court's judgment is patently inconsistent with its findings of facts on the pricing issue so that *the trial court erred as a matter of law* in entering the judgment it did in light of its findings of fact." (Emphasis added).

Tracker's responses perplex us. On the one hand, Tracker claims that the trial court erred as a matter of law. On the other hand, Tracker consciously and intentionally decided not to cite us to the law it claims the trial court violated, even in the face of a court rule that required it to do so. Rule 84.04(d)(5). Tracker's decision places us in a dilemma. If we dismiss Tracker's point for violation of the rule, we deny Tracker the opportunity for a decision on the merits of its claim, which is our preference if at all possible. *BBCB, LLC v. City of Independence*, 201 S.W.3d 520, 530 (Mo.App.2006). If we proceed to the merits of Tracker's claim, however, we could not, with any integrity, tell the trial court it erred as a matter of law but not identify for the trial court the law giving rise to that error. Yet, if we took it upon ourselves to research, find, and identify the law that the trial court violated, we would be acting as an advocate for Tracker, which is something we cannot and will not do. *Sullivan v. Sullivan*, 159 S.W.3d 529, 537 (Mo.App.2005). We resolve this dilemma by making the four following observations.

First, some of the legal questions that would have to be addressed and resolved in deciding the merits of Tracker's point are as follows: What are the *legal* elements of a breach of contract claim which Tracker claims it established? Was the trial court *legally* required to make the factual finding which Tracker alleges is contrary to the judgment? In making this determination, what is the *legal* effect of a general request for findings of fact without any specificity as to which disputed issues such findings are requested? If the challenged finding was not required to be made by the trial court, what is the *legal* effect of a gratuitous finding upon our review of the judgment? If the trial court was required to make the challenged finding, are we *legally* bound to consider only that finding to the exclusion of other findings, if such other findings are supported by substantial evidence and support the judgment entered by the trial court? Also in the latter situation, are we *legally* required to accept the challenged finding for our review of the judgment even if it is not supported by substantial evidence? What is the *legal* effect upon our review if Tracker failed to establish one of the *legal* elements for breach of contract unrelated to the challenged finding?

Second, the proper resolution of each of these questions would require researching, reviewing, analyzing, and synthesizing statutes, court rules, and prior cases, i.e., the law, in relation to the facts of this case.

Third, if we were to engage in these activities to answer the questions presented from Tracker's perspective, we would be acting as an advocate for Tracker.

Fourth, Tracker intentionally chose not to provide any legal authority supporting its position in express contravention of Rule 84.04(d)(5). Tracker asserts that the rule does not state "that a list of authorities must be given when none are relied

---

dismiss was filed, alleges or argues that any finding of the trial court related to the Detwiler breach of contract claim is against the weight of the evidence. Except for very limited exceptions, none of which apply here, we cannot consider any claims of error not briefed. Rule 84.13(a).

upon." We agree that it does not so state. Unfortunately for Tracker, when it decided not to rely upon any legal authority to support its claim of error, it also foreclosed us from relying on any legal authority in making our decision in its favor on its claim.

When "an appellant neither cites relevant authority nor explains why such authority is not available, the appellate court is justified in considering the point abandoned." *Sexton v. Omaha Prop. & Cas. Ins. Co.*, 231 S.W.3d 844, 850 (Mo. App.2007) (quoting *Osage Water Co. v. City of Osage Beach*, 108 S.W.3d 751, 755 (Mo.App.2003) and citing *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978); *Shiyr v. Pinckney*, 896 S.W.2d 69, 71 (Mo. App.1995)); *In re Marriage of Clinton*, 231 S.W.3d 317, 323 (Mo.App.2007). Tracker's point fourteen is deemed abandoned and should be dismissed. Detwiler's Motion to Dismiss is sustained.

### (6) Decision

The portion of the judgment for engineering services in the amount of $6,750 plus prejudgment interest thereon is reversed, and the case is remanded for the trial court to enter judgment in accordance with this opinion. In all other respects, the judgment of the trial court is affirmed.

BATES, C.J., P.J., and BARNEY, J., concur.